# FRONTIER AIRLINES

**EXHIBIT**

**13**

Business Credit Card Company Statement

Card issued by Barclays Bank Delaware

| 10-03 | 10-04 | 55432862277000568963871 | DENVER CNTY CRTS INT  720-865-7834 CO | 'Scott' | $25.98 ✓ |
| 10-03 | 10-05 | 55417342278582781541890 | FRONTIER 42271603709296 ATLANTA  GA | | $608.10 ✓ |
| | | F9 | ANDREWS/JEAN F IAH   DEN | Scott - expert travel | |
| | | F9 | AGENCY: 11617270 EXPEDIA INC | | |
| | | UA | DEN   IAH | | |
| 10-06 | 10-08 | 55432862280000523893499 | INT*INTELIUS.COM/RT   877-974-6141 WA | Scott | $0.97 ✓ |

**For Customer Service Please Contact Us:**



**By Mail:**
Business Card Services
P.O. Box 84030
Columbus, GA 31908-4030

**Online:**
www.FrontierAirlinesBizCard.com



**By Phone:**
1-866-383-8317

Page 3 of 4

000-0438-000-0901-A1D00101

Invoice

Date: Nov 20, 2012

Jean F. Andrews    *Jean F. Andrews*
1255 19th Street
Beaumont, TX 77706
409-351-5216
jean.andrews@lamar.edu

To: Robertson & Fox Law Office

Hourly rate @ $150. Per hour, $100 per hour travel time, plus expenses
Re: Major John Michael Scott

**Travel:**
Sunday, Oct 7th: 3 hours from Beaumont to Houston IAH, flight to Denver 2 hours
Wed, Oct 10: 2 hour flight, drive from IAH to Beaumont 3 hours
Total travel time = 10 hours (@ $100. Hr) = $1000.

**$1,000.**

**Work:**
4 hours: reading materials
1 hour telephone conferences
2 hours: testing at jail
5 hours: grading tests and report writing
12 hours @ $150. Per hour = $.

**Total work = $1800**                    **$1,800.**

**Expenses**
Mileage to IAH airport = 70 miles X 2 x $.50 = $70.00
Airfare: prepaid by Robertson & Fox
Hotel: 2 nights only $518.
Food:
$6.04
$6.50
Parking in Houston at airport= $29.81
Cabs from and to airport: $110.
UPS mail of records: $78.00

Total Expenses: $818.00                   **$818.35**

**Grand Total =      $3,618.35**



**TownePlace Suites by Marriott**
Denver Downtown

685 Speer Blvd. | Denver, CO 80204-4513
phone 303.722.2322

J. Andrews

room: 334

room type: TOBT

number of guests: 1    clerk:

rate: $259.00

arrive: 07Oct12      time: 09:59PM      depart: 10Oct12      time:      folio number: 57976

| Date | Description | Charges | Credits |
|------|-------------|---------|---------|
| 07Oct12 | room charge | 259.00 | |
| 07Oct12 | city tax | 27.84 | |
| 07Oct12 | state occupancy tax | 7.51 | |
| 07Oct12 | cultural facilities dist | 2.59 | |
| 07Oct12 | rtd district | 0.26 | |
| 08Oct12 | room charge | 259.00 | |
| 08Oct12 | city tax | 27.84 | |
| 08Oct12 | state occupancy tax | 7.51 | |
| 08Oct12 | cultural facilities dist | 2.59 | |
| 08Oct12 | rtd district | 0.26 | |
| 09Oct12 | room charge | 259.00 | |
| 09Oct12 | city tax | 27.84 | |
| 09Oct12 | state occupancy tax | 7.51 | |
| 09Oct12 | cultural facilities dist | 2.59 | |
| 09Oct12 | rtd district | 0.26 | |
| 10Oct12 | Visa | | 891.60 |

*2 days only* (handwritten)

card #: VIXXXXXXXXXXXX6790/XXXX
amount:  891.60  auth: 620820  signature on file
this card was electronically swiped on 07oct12

balance:    0.00

As a Rewards Member, you could have earned points toward your free dream vacation today. Start earning points and elite status, plus enjoy exclusive member offers. Enroll today at the front desk.

Refer a friend to the TownePlace Suites by Marriott Denver Downtown and receive 1,000 Marriott Rewards Points! See the Front Desk for Details.

Want your final hotel bill by email? Just ask the Front Desk! See "Internet Privacy Statement" on Marriott.com.





RECEIPT

DATE 10/18/12

FROM Denver airport

TO Hotel

FARE $ 55 00

CAB#

**YELLOW CAB**
7500 E. 41ST AVE., DENVER, CO 80216
**777-7777**

RECEIPT

DATE 10/23

FROM hotel

TO denver airport

FARE $55.00

CAB#

**YELLOW CAB**
7500 E. 41ST AVE., DENVER, CO 80216
**777-7777**

**7-ELEVEN**
303 N BROADWAY
DENVER CO 802033920
3037224960
STORE#: 23172

| | | |
|---|---|---|
| 1 | npl water 5 single | 0.99F |
| 1 | BD W. ... lAlmnd 1.5z | 1.29F |
| 1 | BD m..Nt. lAlmnd 1.5z | 1.29F |
| 1 | KbIrIs+rProtst. Cr krs | 0.79F |
| 1 | Red Deilcrous Apple | 0.99F |
| 1 | DM Banana | 0.69F |

SUBTOTAL            6.04
TOTAL DUE           6.04
CASH               20.04
CHANGE             14.00

THANK YOU COME AGAIN
**** REPRINT ****
T#02 OP16 TRN9086 10/08/2012 07:36 am

**FRONTIER**

Airline: Republic Airways
Date: 10/07/2012 07:38:57PM
Flight: 147 IAH DEN
Transaction Number:
12100/79385747449
Receipt #: 63

Product Summary

| Product | Qty | Price |
|---|---|---|
| F/D Sandwich | 1 | $6.50 |
| Total: | | $6.50 |

Purchaser's Name:
ANDREWS JEAN F
Last 4 digits of Credit Card:
***********6790

For our guaranteed lowest
fare,book online at
www.frontierairlines.com

10/10/12 12:30
$ 29.81 B1FC VISA
N 25.50T 4.31
10/07/12 EN 20
6654/17/00000100/054956
4/1056
17:36

**theParkingSpot**

## Shipment Receipt:  Page 1 of 1

THIS IS NOT A SHIPPING LABEL. PLEASE SAVE FOR YOUR RECORDS.

**SHIP DATE:**
Wed, Nov 14, 2012

**EXPECTED DELIVERY DATE:**
THUR. NOV 15, 2012 10:30 AM

**SHIP FROM:**
JEAN ANDREWS
1255 19TH ST
Beaumont TX 77706
(409) 351-5216

**SHIP TO:**
FOX & ROBERTSON
AMY ROBERTSON
104 BROADWAY
STE 400
DENVER CO 80203-3972
Business

**SHIPPED THROUGH:**
The UPS Store #5119
BEAUMONT, TX 77706-7272
(409) 860-0700

**SHIPMENT INFORMATION:**
UPS Next Day Air Com
4.50 lbs actual wt
5.00 lbs billable wt
Carrier Pack Store Packed
E-mail Notification: Ship

Tracking Number: 1zE077R20190655651
Shipment ID: MMOO68NVGFWNW
Order/Item #: Order / Item #
Ref#: Reference #

**DESCRIPTION OF GOODS:**
DOCS

**SHIPMENT CHARGES:**

| | |
|---|---|
| Next Day Air Com | $67.95 |
| Service Options | $0.00 |
| Fuel Surcharge | $9.51 |
| CMS Processing Fee | $0.20 |
| **Total** | **$77.66** |

COMPLETE ONLINE TRACKING:
Enter either of these addresses in your web browser to track:
http://theupsstore.com (select Tracking, enter Shipment ID #)
http://ebo.com (select Tracking, enter Shipment ID #)

SHIPMENT QUESTIONS? Contact SHIPPED THROUGH above.

CUSTOMER ACKNOWLEDGEMENT: I acknowledge and accept Terms & Conditions in force for tendering shipments through this location and certify that address, content and values provided for this shipment are accurate in all respects.

Signature:

ShipmentID: MMOO68NVGFWNW

Powered by iShip(r)
11/14/2012 09:46 AM  Pacific Time N

SEE REVERSE OR REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.

The UPS Store - #5119
3195 Dowlen Rd.
Suite 101
Beaumont, TX 77705
(409) 860-0700

11/14/12  11:48 AM

We are the one stop for all your
shipping, postal and business needs.

Need blueprints copied or printed?
Let us professionally handle your job!!

001 001005 (001)              TO $  77.66
NDA
Tracking# 1ZE077R20190655651

SubTotal  $  77.66
Total  $  77.66

VISA  $  77.66
ACCOUNT NUMBER *    ************4430
Appr Code:   (K)  Sale

Receipt ID 83735329350607888465 001 Items
CSH: Heather          Tran: 4845 Reg: 001

Visit our new Website at
www.theupsstorelocal.com/5119

Whatever your business and personal
needs, we are here to serve you.

ENTER FOR A CHANCE TO
WIN $1000

We value your feedback
To enter please complete the customer
satisfaction survey located at:

www.theupsstore.com/survey

For official rules and Terms and
Conditions go to www.theupsstore.com
and click on the Customer Experience
Survey link

1

April 6, 2013

Invoice

Jean F. Andrews, Ph.D.
1255 19th Street
Beaumont, TX 77706
409-351-5216 cell
409-880-2265

To: Amy Robertson
Fox& Robertson

Re: **Major John Michael Scott Case**

Rates: Work: hourly rate = $150.: Travel: hourly rate = $100.

**Travel**
Beaumont (BMT) to Denver,  Wednesday, March 27, 2013 (Flight leaves 7:20pm).
Leave BMT at 3:00pm, travel 70 miles to airport
Arrive Denver at 9:00pm. Drive to hotel, arrive at hotel at 10:00pm
Total travel time from BMT to Denver: 7 hours

Denver to BMT, Saturday, March 30, 2013 11:00am, arrive BMT at 2:00 pm. Drive to
BMT (70 miles). Arrive BMT 6:00pm (7 hours travel time).
Total travel time from Denver to BMT: 7 hours

Total travel time = 14 hours @ $100. Per hour = $1400.

Hotel:  Town Place Hotel
3 nights = $452.00 (with some food charges)

Mileage from BMT to Houston airport = 140 miles round trip X $.50 per mile =
$70.00.

Parking at Houston airport 2 $19.50.

Airplane Ticket  = $718.00
Baggage @ $25.
Total Airfare/baggage =  $743.

Rental Car @ $385.67

Total Travel = $3,070.17

we paid
4064.50
rest to be
paid by
City 5/3/13
Check 11632

Work: **reading documents, reviewing rebuttal report, phone conferences, meeting with attorneys, deposition**

2-17-13: 1 hour
3-7-13: 1 hour
3-8-13: 3 hours (watch videotapes, readability of documents
3-26-13: 2.5 hours (reading documents)
3-27-13: 2 hours (reading documents)
3-29-13 5 hours (meeting with attorney)
3-30-13: 6 hours (deposition)

Total work hours = 21.5 x $150. Hour = $3,225.

Total Travel ($3,170.67) + total work ($3,225) =

**Grand Total: $6,295.17**

**EXHIBIT**

**14**

### Amy F. Robertson
Fox & Robertson, P.C.
104 Broadway
Suite 400
Denver, CO 80203
303.595.9700

## EXPERIENCE

1996-present     Fox & Robertson, P.C., Denver, CO.  Co-founded law firm practicing in all areas of civil rights with a focus on disability rights.  Representative cases include the largest settlement of a disability rights public accommodations case -- *Lucas v. Kmart Corp.* -- as well as other class and individual actions under the Americans with Disabilities Act against national fast-food chains, city governments, and retail stores based on their inaccessible premises and/or policies of segregation, employment discrimination cases based on age, race and disability, cases challenging abuse and neglect in nursing homes, and cases against developers for failure to build accessible housing.  Certified as class counsel in the following class actions brought under state and/or federal disability rights laws: *Colorado Cross-Disability Coaltion v. Abercrombie & Fitch Co.*, 09-cv-2757-WYD-KMT (D. Colo.);  *Vallabhapurapu v. Burger King Corp.*, 3:11-cv-00667-WHA (N.D. Cal.); *Castaneda v. Burger King Corp.*, 08-cv-4262-WHA (N.D. Cal.); *National Federation of the Blind v. E\*Trade Access, Inc.*, Civ. Action No. 03 11206-MEL (D. Mass.); *Lucas v. Kmart Corp.*, 99-cv-01923-JLK (D. Colo.); *Moeller v. Taco Bell*, No. 02-cv-5849 PJH (N.D. Cal.).

1995-1996     Rothgerber, Appel, Powers & Johnson, Denver, CO.  Associate.

1991-1995     Wilmer, Cutler & Pickering, Washington, DC.  Associate.

1989-1991     Dorsey & Whitney, Minneapolis, MN. Associate.

1988-1989     United States District Court, Eastern District of Virginia, Richmond, VA. Law Clerk to The Honorable Richard L. Williams.

## EDUCATION

1985-1988     Yale Law School, J.D.  Executive Editor, Yale Journal of International Law; team member, 1987 Jessup International Law Moot Court Competition.

1983-1984     National Taiwan University, Department of Law, Taipei, Taiwan.  ITT International Fellowship to study Chinese law.

1978-1983     Swarthmore College, B.A. with High Honors. Major in linguistics; minor in philosophy; Phi Beta Kappa.

## PUBLICATIONS & PRESENTATIONS

"Commentary: A Lawyer Deciphers the ADA's Upcoming Supreme Court Challenge," published in the on-line disability magazine cando.com (Jul. 24, 2000).

Co-author (with Timothy P. Fox) of "Federal Laws Addressing Discrimination in Employment Based on Disability," in <u>Colorado Employment Law</u>.

"Standing to Sue Under Title III of the ADA," Colorado Lawyer (March 1998).

Numerous presentations to legal and lay audiences on the Americans with Disabilities Act, Rehabilitation Act, the Fair Housing Act and other anti-discrimination laws.

## AWARDS

2012 Award of Excellence, Colorado Chapter of the American College of Trial Lawyers
2007 Impact Fund Award (with Tim Fox)
2006 Colorado Trial Lawyers Association Case of the Year (with Tim Fox)
2003 Paul A. Bilzi Memorial Access Award (with Tim Fox)
Recognized as a "Super Lawyer" by 5280 Magazine in 2007 and 2008
Recognized by the Denver Business Journal as one of the ten most powerful lawyers in Denver in 2006.

## BAR MEMBERSHIPS

Colorado
District of Columbia (inactive)
Minnesota (inactive)
United States Supreme Court
United States Courts of Appeals for the Eighth, Ninth, Tenth, Eleventh, and District of Columbia Circuits
United States District Courts for the Districts of Colorado, Minnesota, and the District of Columbia.

## PROFESSIONAL MEMBERSHIPS

American Bar Association
Colorado Bar Association
District of Columbia Bar Association
Plaintiff Employment Lawyers Association
National Employment Lawyers Association
American Association for Justice
Disability Rights Bar Association (Vice-Chair 2013-14)
Fair Housing for All
Faculty of Federal Advocates (Board Member 2005-2007)

Fox & Robertson is an Associate Member of the National Disability Rights Network

EXHIBIT

15

## FOX & ROBERTSON, P.C.

ATTORNEYS AT LAW
104 BROADWAY
SUITE 400
DENVER, CO 80203

WWW.FOXROB.COM
AROB@FOXROB.COM

TIMOTHY P. FOX
AMY F. ROBERTSON

VOICE: 303.595.9700
TTY: 877.595.9706
FAX: 303.595.9705

January 6, 2012

By email and first class mail
Douglas J. Friednash
Denver City Attorney
Office of the City Attorney
1437 Bannock St., Room 353
Denver, CO 80202
city.attorney@denvergov.org

Re:    Major Jon Michael Scott

Dear Mr. Friednash:

This firm and Carrie Ann Lucas of the Center for Rights of Parents with Disabilities, represent Major Jon Michael Scott. Mr. Scott, who is deaf, was an inmate at the Denver County Jail and other Denver facilities on several occasions in 2010 and 2011. During these stays, he was not provided with a sign language interpreter and was denied other accommodations and auxiliary aids and services, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*, and section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

Mr. Scott is prepared to file a lawsuit in federal court for injunctive relief, damages and attorneys' fees for violation of his rights under these statutes. However, he is willing to work with the City to resolve his claims before he files. If the City is interested in such a negotiation, please execute the enclosed Tolling Agreement and email it to me at the email address above on or before January 9, 2012. If we do not receive the signed agreement by that time, we will file suit on January 10, 2012. I apologize for the tight timeline, but one of Mr. Scott's detentions commenced on January 10, 2010, so we are facing a deadline to file.

Ms. Lucas and I are also counsel for the plaintiffs (along with the firm of King & Greisen) in the case of *Ulibarri v. City and County of Denver*, No. 07-1814-OMS-MJW, which also alleges that the City violated the ADA and Rehabilitation Act by failing to provide interpreters and other accommodations to deaf detainees. I am sending a courtesy copy of this letter to the Assistant City Attorneys on that case.

Douglas J. Friednash
Denver City Attorney
January 6, 2012
Page 2

      Please feel free to call me if you have any questions.

                                  Sincerely,

                                  FOX & ROBERTSON, P.C.

                                  Amy F. Robertson

cc:    Robert A. Wolf, Assistant City Attorney (by email to robert.wolf@denvergov.org)
       Suzanne Fasing, Assistant City Attorney (by email to suzanne.fasing@denvergov.org)
       Carrie Ann Lucas, Esq., Center for Rights of Parents with Disabilities (by email to
       clucas@disabledparentrights.org).

**<u>Tolling Agreement</u>**

The parties to this agreement are the City and County of Denver and its Sheriff Department (collectively "the City") and Major Jon Michael Scott ("Scott").

The City agrees that, as of January 6, 2012, any and all statutes of limitations applicable to any claims by Scott (including, but not limited to, all judicial deadlines and all administrative requirements that may be required to be satisfied prior to filing a civil law suit, and including but not limited to all claims for damages, declaratory relief, injunctive relief, and/or attorneys' fees) alleging discrimination on the basis disability under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794, or any other statute addressing the rights of people with disabilities under state or federal law, and 42 U.S.C. § 1983, are hereby tolled.

The City and County of Denver

By: _____

Its: _____

Date: _____

Major Jon Michael Scott

_____

Date: _____

EXHIBIT

16

FOX & ROBERTSON, P.C.

ATTORNEYS AT LAW
104 BROADWAY
SUITE 400
DENVER, CO 80203

WWW.FOXROB.COM
AROB@FOXROB.COM

TIMOTHY P. FOX
AMY F. ROBERTSON

VOICE: 303.595.9700
TTY: 877.595.9706
FAX: 303.595.9705

February 16, 2012

<u>By email</u>
Suzanne A. Fasing, Esq.
Denver City Attorney's Office
Litigation Section
201 W. Colfax Ave., Dept. 1108
Denver, CO 80202

      Re:   *Ulibarri et al. v. City and County of Denver et al.*
             07-cv-1814-WDM-MJW

Dear Suzanne:

     During yesterday's mediation, Judge Meyer let us know that the City believes Major Jon Michael Scott received accommodations. It is our understanding that, at most, he received accommodations while in court, but did not while at the PADF or Denver County Jail. Before filing his complaint, we sent Open Records Requests to Mary Dulacki and Lorrie Kosinski. None of the records Ms. Dulacki sent us indicate that the City provided Mr. Scott an interpreter; Ms. Kosinski did not send any documents.

     We also provided the City the opportunity to execute a tolling agreement so that we could discuss resolution of the Scott case pre-filing. The City declined.

     If the City has evidence that could assist in narrowing or even resolving the Scott case, we would urge you to provide it to us so that we can avoid unnecessary litigation and the concomitant attorneys' fees and costs.

                  Sincerely,

                  FOX & ROBERTSON, P.C.

                  */s/ Amy F. Robertson*

                  Amy F. Robertson

cc:    The Hon. William Meyer (by first class mail)
        Joseph Rivera, Esq. (by email)
        Carrie Ann Lucas, Esq. (by email)



**EXHIBIT**

**17**



**U.S. Department of Justice**

Civil Rights Division

*Disability Rights Section - NYA*
*950 Pennsylvania Ave, NW*
*Washington, DC  20530*

November 20, 2012

By Electronic Mail and First Class Mail to:

Joseph Rivera, Esq.
Denver City Attorney's Office
201 W. Colfax Ave., Dept. 1108
Denver, CO 80202-5332

E-mail: dlefiling.litigation@denvergov.org

RE:     Scott v. City and County of Denver
        DJ # 204-13-308

Dear Mr. Rivera:

In response to a complaint filed regarding the City and County of Denver, the U.S. Department of Justice has opened an investigation to determine whether any violations of title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12131-12134, and the Department's implementing regulation, 28 C.F.R. Part 35, have occurred.  Among other things, title II of the ADA prohibits discrimination against individuals with disabilities by public entities.  The text of the ADA, the Department's regulation, and many technical assistance publications can be accessed on our ADA Home Page at <u>www.ada.gov.</u>

<u>Administrative Investigation</u>

The complainant, Major Jon Michael Scott, alleges that Denver failed to provide appropriate auxiliary aids and services to him and others who are deaf or hard of hearing on numerous occasions over the last several years.

The ADA authorizes the Department of Justice to investigate alleged violations of title II. 28 C.F.R. § 35.172.  We are also authorized to take appropriate action, including filing an enforcement action in U.S. District Court, to enforce title II if voluntary compliance is not achieved, and to seek injunctive relief and monetary damages.  28 C.F.R. § 35.174.

The allegations raised in the complaint, if proven, also may constitute violations of Section 504 of the Rehabilitation Act of 1973, as amended, which prohibits discrimination on the basis of disability in programs or activities that receive Federal funds or assistance.  Thus, since Denver's Police and Sheriff's Departments receive Federal funds or assistance from the Department of Justice, the complaint will be investigated under Section 504, as well as title II of the ADA.

DJ 204-13-308
November 20, 2012
Page 2 of 4

We would like to resolve this matter expeditiously.  We thus seek your cooperation in providing certain preliminary information.  Please provide the following information, in writing or by email, within 30 days of the date of this letter.  If any of the information is available online, please send me the appropriate URL along with a description of the web pages' contents.

1. The name, address, and telephone number of the individual to whom this office should direct any future questions and correspondence.  Please indicate if this person has authority to negotiate a settlement of this matter.

2. Your response to the allegations of the complaint and any additional information you consider relevant to resolution of the complaint.

3. To the extent that they were not already provided as part of Denver's response to our Project Civic Access review, DJ 204-13-298, or have been updated since then, your policies and procedures regarding the provision of qualified sign language or oral interpreters and other auxiliary aids and services (e.g. note takers, transcription services) for communication with persons who are deaf or hard of hearing during arrest, booking, holding suspects, receiving citizen complaints; interrogating or interviewing witnesses; operating telephone (911) emergency centers; providing emergency medical services; or any other Police Department or Sheriff's Department programs, services, or activities, and the date these policies went into effect.

4. The procedures by which Police Department and Sheriff's Department staff may obtain these services such as qualified sign language interpreters, including any particular agreements or contracts with agencies or individuals.

5. A description of how the Police Department and Sheriff's Department notify persons who are deaf or hard of hearing of the availability of auxiliary aids or services and the procedures for requesting them.

6. A description of all requests for auxiliary aids/interpreters for persons who are deaf or hard of hearing in the past three years and how the Police Department and Sheriff's Department responded to them.

<u>United States' Offer to Assist in Settlement Discussions</u>

We are aware of the ongoing private litigation, <u>Scott v. Denver,</u> in which our complainant is a plaintiff and Denver is a defendant.  We have been monitoring the status of that lawsuit. As you are also aware, we have a Project Civic Access review with the City and County of Denver, DJ 204-13-298 (referenced above), one component of which addresses law enforcement and effective communication issues, along with employment, voting, architectural barriers, and other Title II matters.

DJ 204-13-308
November 20, 2012
Page 3 of 4

Given ongoing private litigation, our Project Civic Access review, and our expertise in ADA and Rehabilitation Act policy development and enforcement, we believe it may be helpful for the United States to participate in joint settlement discussions to craft policies and procedures to ensure people who are deaf or hard of hearing – such as crime victims, witnesses, suspects, arrestees, and detainees -- have appropriate auxiliary aids and services leading to effective communication, under circumstances that would not impose an undue burden on your agency or fundamentally alter your programs and services.  We are willing to do so and are extending this offer to you and to plaintiff's counsel as well.  One successful outcome of joint negotiations would be for all parties, including the United States, to enter into a proposed agreement that, if accepted by the court, would resolve both the private lawsuit and our administrative investigation.  This would give Denver confidence and closure once it complied with the terms of such a court-approved agreement.

If we are unsuccessful in crafting an agreement through joint settlement discussions, our normal administrative investigation would continue until it reached resolution through our typical processes, which may include litigation.

Be advised that no one may intimidate, threaten, coerce, or engage in other discriminatory conduct against anyone because he or she has filed a complaint with the Department of Justice, or otherwise either taken action or participated in an action to secure rights protected by the ADA.  Such behavior would constitute an additional ADA violation and, if applicable, a Rehabilitation Act violation.

In any event, we strongly recommend that you consult with us before making any operational changes to resolve this complaint's allegations.  Any such changes must comply with the title II regulations.  Any modifications you undertake which are not in compliance with those requirements may need to be redone before this complaint can be resolved.

If you have questions or concerns, feel free to contact me at 303-454-0151 or by email at mary.lou.mobley@usdoj.gov.

Additionally, I work out of Denver rather than Washington, so please make sure any hard copy correspondence regarding this matter is sent to me at the following address:

> 1225 17th Street, Suite 700
> Denver, CO  80202

If you misdirect correspondence to our Washington, DC office, it will unnecessarily delay my investigation and its ultimate resolution.

Please do not hesitate to contact me if you have any questions.  I look forward to working with you to resolve this matter and, if we can be helpful in doing so, the private litigation as well. Let

DJ 204-13-308
November 20, 2012
Page 4 of 4


me know if you are interested in accepting our offer to meet for the purpose of discussing a global resolution.


Sincerely,

//signed//

Mary Lou Mobley,
Trial Attorney


cc:      Complainants' counsel by email to:  arob@foxrob.com

ADA Coordinator Edward Neuberg, Denver's designated contact person for DOJ's Project Civic Access review, by email to edward.neuberg@denvergov.org

EXHIBIT

18

FOX & ROBERTSON, P.C.

ATTORNEYS AT LAW
104 BROADWAY
SUITE 400
DENVER, CO 80203

WWW.FOXROB.COM
AROB@FOXROB.COM

TIMOTHY P. FOX
AMY F. ROBERTSON

VOICE: 303.595.9700
TTY: 877.595.9706
FAX: 303.595.9705

---

**CONFIDENTIAL SETTLEMENT COMMUNICATION
PROTECTED BY FED. R. EVID. 408**

November 26, 2012

By email to Joseph.Rivera@denvergov.org
Joseph M. Rivera, Esq.
Denver City Attorney's Office
Litigation Section
201 W. Colfax Ave, Dept 1108
Denver, CO 80202

Re:     *Scott v. Denver*, 12-cv-00053-MSK-BNB

Dear Joe:

I am inspired to write by the letter Mary Lou Mobley wrote you on November 20, 2012, informing you that the DOJ was opening an investigation of Mr. Scott's claims. The letter also mentions that the DOJ is conducting a Project Civic Access review of the City and County of Denver, and raises the possibility of joint settlement discussions, a subject we haven't really broached since the scheduling conference.

When Carrie and I reviewed Ms. Mobley's letter, it occurred to us that we are about to enter a fairly expensive stage of the case -- both in terms of our time and in terms of out-of-pocket costs -- and that it might make sense to talk settlement before the fees and costs make resolution any more difficult.

We were also encouraged to learn -- in Lorrie Kosinski's deposition -- of the Sheriff's ADA Committee, which appears to be taking steps to address access issues for deaf inmates in a systematic way.

Please let us know if you would be interested in discussion a resolution of this case.

Sincerely,

FOX & ROBERTSON, P.C.

*/s/  Amy F. Robertson*

Amy F. Robertson

cc:     Carrie Ann Lucas

EXHIBIT
19

## FOX & ROBERTSON, P.C.

ATTORNEYS AT LAW
104 BROADWAY
SUITE 400
DENVER, CO 80203

WWW.FOXROB.COM
AROB@FOXROB.COM

VOICE: 303.595.9700
TTY: 877.595.9706
FAX: 303.595.9705

TIMOTHY P. FOX
AMY F. ROBERTSON

---

**CONFIDENTIAL SETTLEMENT COMMUNICATION
PROTECTED BY FED. R. EVID. 408**

January 14, 2013

By email to Joseph.Rivera@denvergov.org
Joseph M. Rivera, Esq.
Denver City Attorney's Office
Litigation Section
201 W. Colfax Ave, Dept 1108
Denver, CO 80202

Re:   *Scott v. Denver*, 12-cv-00053-MSK-BNB

Dear Joe:

At the urging of Mary Lou Mobley at the Department of Justice, I am writing to set forth a brief overview of our case as well as our settlement position. We continue to believe that it would be in both parties' interest to resolve the case in the near term, as there are a number of events in the next few months that will be very costly in terms of our time and expenses and the City's expenses.

The ADA and Rehabilitation Act require the City to ensure that its communications with deaf people are as effective as communications with hearing people and to provide auxiliary aids and services, including sign language interpreters, where necessary to do so. 28 C.F.R. § 35.160(a)(1), (b)(1). To prevail on such a claim, a deaf person does not have to have requested an interpreter if the City knew of the need, for example, if the need was obvious. *Robertson v. Las Animas County Sheriff's Department*, 500 F.3d 1185, 1196-97 (10th Cir. 2007).

<u>Liability</u>

We believe that we will prevail on liability in this case based on these undisputed facts:

1.   Mr. Scott has a severe to profound hearing loss. According to Dr. Gabbard, even with hearing aids, his hearing loss is moderate to severe, and he cannot hear high pitches such as consonants. Gabbard Depo. at 56.

2.   The City was aware of Mr. Scott's deafness and need for an interpreter; it is also obvious to the casual observer. We understand that it is your litigation position that Mr. Scott was a "savvy player" who did not appear to be deaf. Following your observation today, I hope you will consider that this may not be a convincing argument in court.

Joseph M. Rivera
January 14, 2013
Page 2

3.    The City did not provide a sign language interpreter to Mr. Scott on a number of occasions between the beginning of the statute of limitations in January, 2010, and the filing of the lawsuit in January 2012.  These events included arrests, classification interviews, medical screenings, and other interactions between police or deputies and Mr. Scott.

Damages

Plaintiff will be entitled to recover damages under the ADA and Rehabilitation Act if he can show that the City's conduct was intentional, that is, that the City knew it was likely that it was violating Mr. Scott's rights and did not take action in response.  *Barber ex rel. Barber v. Colorado Department of Revenue*, 562 F.3d 1222, 1228-29 (10th Cir. 2009).  Given the lengthy period of litigation in the *Ulibarri* case and  the level of interaction between City personnel and Mr. Scott before even his January 2010 detention -- as well as the obviousness of his deafness -- this will be straightforward to prove.

Mr. Scott's damages demand is $60,000.  Given that the City was willing to offer Sarah Burke $35,000 for a single instance in which she was denied an interpreter, this request is more than reasonable.

Affirmative measures

As I believe I mentioned in our earlier discussions, we are encouraged by the fact that the City has formed the Sheriff's ADA Committee, which appears to be taking steps to address access issues for deaf inmates in a systematic way.  We would like to work with you to craft a settlement agreement that shares the goals of the Committee:  to ensure that deaf detainees receive effective communication.

Attorneys' fees

Plaintiff's attorneys' fees now stand at approximately $240,000 with approximately $20,000 in out of pocket costs.  Both costs and fees will rise sharply in the near future.  For example, each time we visit Mr. Scott in Cañon City, it takes almost the entire day, including travel time.  To prepare for his deposition, we are likely to make three or four trips in the next month.  Each time we do that, we have to hire an interpreter out of Colorado Springs or Denver.  Both parties will soon face the time and expense of a trip to Beaumont, Texas, for Jean Andrews's deposition.  There are many additional depositions upcoming, as well as motions for summary judgment and pursuant to Rule 702.  And, as you outlined to me earlier, Mr. Scott's deposition will be very expensive for the City, as you will need two ASL interpreters and two certified Deaf interpreters, as well as whatever video crew you hire.  Assuming it goes forward in Cañon City, that will add time and travel expenses for both parties.

\* \* \*

Joseph M. Rivera
January 14, 2013
Page 3

We propose negotiations at this juncture both because we believe that the City's efforts toward compliance make the case amenable to resolution and because we want to be very clear -- should the case not settle and our ultimate attorneys' fee claim be far larger -- that we provided ample opportunity to discuss resolution at earlier, less expensive, points in the case.

Because of the upcoming work in the case and because Carrie will be unavailable the first two weeks of February, it makes sense for us to schedule a meeting -- with Ms. Mobley and a perhaps a magistrate -- before the end of the month.

Please let us know how you would like to proceed.

Sincerely,

FOX & ROBERTSON, P.C.

*/s/  Amy F. Robertson*

Amy F. Robertson


cc:     Carrie Ann Lucas

EXHIBIT

20

## Fox & Robertson, P.C.

Attorneys at Law
104 Broadway
Suite 400
Denver, CO 80203

www.foxrob.com
arob@foxrob.com

Voice: 303.595.9700
TTY: 877.595.9706
Fax: 303.595.9705

Timothy P. Fox
Amy F. Robertson

May 9, 2013

**By email with enclosures**
Wendy Shea, Esq.
Joseph M. Rivera, Esq.
Carol Liang, Esq.
Denver City Attorney's Office
Litigation Section
201 W. Colfax Ave, Dept 1108
Denver, CO 80202

Re:     *Scott v. Denver*, 12-cv-00053-MSK-BNB

Dear Counsel:

As you'll see, Mr. Scott has accepted the City's offer of judgment.  Per its terms, we will be submitting a fee petition to the Court.  Before we do that, though, we wanted to see if the City would be interested in attempting to resolve our fees and costs without incurring the additional costs associated with the fee petition.

Toward that end, I attach our billing and cost records and those of the Center for Rights of Parents with Disabilities.  Plaintiff's fees total $417,126 and out of pocket costs, $28,802.58 for a total of $445,982.58.  For the reasons outlined below, we believe that the Court will award most if not all of this amount.  For purposes of promptly resolving fees and costs, however, we would accept the amount of $404,215.98, representing a 10% discount on our fees and all of our costs.

Should the parties not be able to reach agreement on Plaintiff's fees and costs, we will request the full amount in our fee petition, along with the attorney time and expert costs involved in preparing the petition.

I wanted to note a couple of things about our fees and costs.  We documented our time contemporaneously, and then reviewed it and exercised billing judgment.  You'll see in the records where we decided not to charge for specific time -- indicated with the abbreviation "NC" -- including time devoted to claims against the police and to any and all issues relating to Dr. Schick's criminal record.  Please note that a good deal of paralegal time was devoted to separating out the documents the City produced in large, undifferentiated pdf files, and then to coding two, three, or even four versions of the same document when the City, on several occasions, produced large numbers of duplicates.  You'll also note that we use paralegals to do basic drafting tasks, for example routine motions, to save on fees.  On the cost front, please note

Counsel for the City
May 9, 2013
Page 2

that we regard as overhead (and thus do not bill for) many categories of costs that are ordinarily charged on the bills of paying clients, for example, Westlaw, postage, and long distance. We have included an estimate of Dr. Schick's fees for her deposition although we have not received her bill; if the City would like to pay her directly, we will remove that item.

What remains is the time and expenses that were necessary to achieve the excellent result represented by the City's offer of judgment.

In addition, as we've discussed, the City had the opportunity to settle this case when our fees were (1) negligible (before we filed); (2) under $7,000 (February 15, 2012); (3) under $160,000 (November 26, 2012); and (4) approximately $240,000 (January 14, 2013). "The Tenth Circuit has long accepted the proposition that one of the factors useful in evaluating the reasonableness of the number of attorney hours in a fee request is 'the responses necessitated by the maneuvering of the other side.'" *Robinson v. City of Edmond*, 160 F.3d 1275, 1284 (10th Cir. 1998) (quoting *Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir. 1983)); *see also City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (plurality opinion) ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." (Citation omitted)); *Sussman v. Patterson*, 108 F.3d 1206, 1209 (10th Cir. 1997) ("[T]he hours expended were, in large part, necessarily incurred due to defendants' intransigence in refusing to negotiate or discuss settlement before and after suit was filed.")

Our rates, too, are reasonable in light of market rates and previous court approvals. For example, Judge Krieger herself approved our attorneys' fees against the City in the class action settlement in *Colorado Cross-Disability Coalition v. City and County of Denver*, 06-cv-00865-MSK-BNB, in which my rate was -- five years ago -- $360. I'm attaching the fee petition for your reference, which also describes my background and relevant experience. My current Colorado[1] rate of $440 reflects reasonable increases over the ensuing five years. It is also supported by the CBA's 2008 Economic Survey which showed -- again, five years ago -- rates for attorneys 16 to 25 years out school of $420 and in zip codes 80202 and 80203 of $451. *See* http://www.cobar.org/repository/LPM%20Dept/2008EconSurvey.pdf at 27.[2] I graduated in 1988 -- 25 years ago. *See also, generally, Lucas v. Kmart Corp.*, 2006 WL 2729260 (D. Colo. July 27, 2006) (reviewing and approving our rates, hours, and costs and endorsing the expert on whom we will rely).

Similarly, Carrie's rate of $290 is reasonable for an eighth-year attorney. It is, for example, midway between the rate of $345 for a 14-year attorney and $160 for a first year that Judge Morris Hoffman endorsed in 2011 in the attached decision in *Colorado Cross-Disability Coalition v. Colorado Dep't of Health Care Policy and Financing*, 09CV11761. It is below the rate shown in the 2008 CBA study ($347) for attorneys with six to ten years of experience. *Id.* at 27.

---

[1]     We recently received approval of our attorneys' fees in a class action settlement in California in which my rate was $725.

[2]     This is available to members of the CBA. If you are not a member, let me know and I'll send you the pdf.

Counsel for the City
May 9, 2013
Page 3

Should the City decline our offer to resolve attorneys' fees at the discounted amount above, we will be forced to spend time drafting a fee petition and to retain an expert witness to review the file, our billing records, and our costs and to opine on their reasonableness.  This time and expense will also be recoverable.  *See, e.g., Case v. Unified School Dist. No. 233*, 157 F.3d 1243, 1254 (10th Cir. 1998).

Because we have 14 days from entry of judgment to file our fee petition, please let us have your response to this offer by Wednesday, May 15, 2013, so that we and our expert will have sufficient time to prepare.

Please feel free to contact Carrie or me if you have any questions.

Sincerely,

FOX & ROBERTSON, P.C.

*/s/ Amy F. Robertson*

Amy F. Robertson

cc:      Carrie Ann Lucas (by email; with enclosures)

Enclosures:

    Fox & Robertson billing records
    Fox & Robertson cost records
    CRPD billing records
    CRPD cost records
    *CCDC v. Denver* fee petition
    *CCDC v. HCPF* order



**EXHIBIT 21**



**THE MILE HIGH CITY**

MICHAEL B. HANCOCK
Mayor

**DEPARTMENT OF LAW**
**DOUGLAS J. FRIEDNASH**
**CITY ATTORNEY**

Litigation Section

201 West Colfax Avenue, Dept.  1108
Denver, CO  80202-5332
p: 720-913-3100
f: 720-913-3190
f: (Claims) 720-913-3182

May 22, 2013

**By email**
Amy Robertson.
Fox and Robertson
104 Broadway, Suite 400
Denver, CO 80203

     Re:    *Scott v. Denver*, 12-cv-00053-MSK-BNBS

Dear Counsel:

     On May 9, 2013, Mr. Scott accepted Denver's offer of judgment.  At that time, you provided billing and costs records, claiming fees of $417,126 and costs of $28,802.58.  You also indicated that in an effort of resolve the fee and cost issues without the involvement of the court, you would accept $404,215.98 as a full resolution of outstanding fees and costs.

     We do not agree with your assessment that the court will award most, if not all, of the fees and costs you claimed to have incurred.  We hired an expert to conduct a preliminary review of the billing and costs records and the expert does not agree with your position.  Instead, our expert believes that reasonable fees and costs in this case would be in the range of $100,000 to $150,000.  As a result, we are willing to offer somewhere in this range as compensation for reasonable attorney fees and costs incurred.  We are open to further discussing this matter to see if a resolution may be reached without involvement of the court.  However, in the absence of an agreement to substantially reduce the total amount of fees and costs you are seeking to recover, it does not appear that we will be able to resolve this issue without court involvement.

     Please feel free to contact me if you have any questions.

                    Regards,
                    *s/ Joseph Rivera*
                    Joseph Rivera

cc:    Carrie Lucas (by email)
       Wendy Shea (by email)
       Carol Liang (by email)

EXHIBIT

22

**Amy Robertson**

| | |
|---|---|
| **From:** | Amy Robertson |
| **Sent:** | Friday, May 24, 2013 1:45 PM |
| **To:** | 'Rivera, Joseph M. - Department of Law'; Shea, Wendy J. - Department of Law |
| **Cc:** | Carrie Ann Lucas; Liang, Carol - City Attorney Office; Timothy Fox; Caitlin Anderson |
| **Subject:** | RE: Notice of acceptance; offer to resolve fees. |

Joe & Wendy –

As an initial matter, we would like to request an extension on our deadline to file the fee petition until June 26.  The Court entered judgment yesterday which – with the 7-day extension to which the parties have agreed – would put our deadline at June 13.  Tim and I have an oral argument to the Ninth Circuit on that day and Carrie will be out of town on vacation from June 4 to 24.  Please let us know your position on this so we can get a motion for extension on file.

In addition, I wanted to let you know that we appreciate the response below.  While we, too, are open to further discussion toward the goal of informal resolution, your letter does not, unfortunately, provide grounds for us to counteroffer.  It cites no cases, nor does it identify any basis for us to reduce our lodestar.  While we would be willing to review any specific reductions your expert could identify and support, the general "belief" that our fees should be lower does not provide anything for us to review.

We have analyzed a number of Judge Krieger's fee decisions and cannot find any that reduce the lodestar by 70% to 82%* as you suggest.  In fact, while some of her decisions reduce the lodestar for partial success, that factor is not present here:  Plaintiff prevailed on both of his (essentially identical) claims; and there is no work for which we are claiming fees that was not necessary to that outcome.

Feel free to contact us if you would like us to review any specific grounds you may have for the reduction you propose.

-   Amy

*These figures compare our lodestar ($417,126) with the fee portion of your range ($72,000 to $122,000).

**From:** Rivera, Joseph M. - Department of Law [mailto:Joseph.Rivera@denvergov.org]
**Sent:** Wednesday, May 22, 2013 5:58 PM
**To:** Amy Robertson
**Cc:** Carrie Ann Lucas; Shea, Wendy J. - Department of Law; Liang, Carol - City Attorney Office
**Subject:** RE: Notice of acceptance; offer to resolve fees.

Amy,

Please find attached Denver's response to your letter dated May 9, 2013.

Regards,
Joe



**Joseph Rivera | Assistant City Attorney**

Denver City Attorney's Office - Litigation Section | City and County of Denver

720.913.3120 Phone | 303.885.0145 Cell

joseph.rivera@denvergov.org

This e-mail and any attachments thereto are intended only for use by the addressee(s) named and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachment(s) thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me and permanently delete the original and any copies of the e-mail, any attachment(s) thereto, and any print-out(s).

**From:** Amy Robertson [mailto:ARob@foxrob.com]
**Sent:** Thursday, May 09, 2013 5:10 AM
**To:** Shea, Wendy J. - Department of Law; Rivera, Joseph M. - Department of Law; Liang, Carol - City Attorney Office
**Cc:** Carrie Ann Lucas; Caitlin Anderson; Jennifer Elstran
**Subject:** Notice of acceptance; offer to resolve fees.

Counsel –

Please see attached acceptance, letter, and attachments to the letter.  I'm headed out on vacation for the next four days and won't have email again until Monday.  If you have any questions before then, please call or email Carrie.

Thanks.

- Amy

Amy F. Robertson
Fox & Robertson, PC
104 Broadway
Suite 400
Denver, CO 80203
Voice: 303.595.9700
TTY: 877.595.9706
Fax: 303.595.9705
Web: www.foxrob.com
Twitter: @FoxRobLaw

**EXHIBIT 23**

**Amy Robertson**

| | |
|---|---|
| **From:** | Shea, Wendy J. - Department of Law [Wendy.Shea@denvergov.org] |
| **Sent:** | Thursday, May 30, 2013 9:49 AM |
| **To:** | Amy Robertson |
| **Cc:** | Rivera, Joseph M. - Department of Law |
| **Subject:** | Scott Attorney Fees |

Hi Amy:

Thanks for the message about the possibility of mediating the attorney fee issue.  However, it does not seem to make sense to have Denver pay to try to mediate attorney fees since we were not able to get anywhere on the amount of the attorney fees during the last mediation.  Therefore, as soon as possible, we will send you a letter briefly outlining our concerns regarding the billing statements provided and the basis therefor so that we may determine if further negotiations might be beneficial or if it makes more sense for us to proceed to a hearing with Judge Krieger.

Thanks.



**Wendy J. Shea | Assistant City Attorney**
City Attorney's Office | City and County of Denver
720.913.3112 Phone

This e-mail and any attachments thereto are intended only for use by the addressee(s) named and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachment(s) thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me and permanently delete the original and any copies of the e-mail, any attachment(s) thereto, and any print-out(s).



EXHIBIT
**24**



**DENVER**
THE MILE HIGH CITY

MICHAEL B. HANCOCK
Mayor

**DEPARTMENT OF LAW**
**DOUGLAS J. FRIEDNASH**
**CITY ATTORNEY**

Litigation Section

201 West Colfax Avenue, Dept.  1108
Denver, CO  80202-5332
p: 720-913-3100
f: 720-913-3190
f: (Claims) 720-913-3182

June 13, 2013

**By email**
Amy Robertson
Fox and Robertson
104 Broadway, Suite 400
Denver, CO 80203

Re:   *Scott v. Denver*, 12-cv-00053-MSK-BNB

Dear Counsel:

Denver questions the basis for many aspects of the fee schedule you submitted on May 9, 2013.  The areas of hourly rates and time jointly billed may be a starting point for productive discussions regarding a negotiated settlement of claimed costs and fees.

First, the requested hourly amount for attorneys' fees is too high, and Denver does not agree with your assessment that the court will award the requested hourly amount.  You rely on *Colo. Cross-Disability Coalition v. City and County of Denver*, 06-cv-00865-MSK-BNB, as support for your claimed hourly rate of $440 per hour in the *Scott* case.  This reliance is misplaced.  The cited case does not support your proposed hourly rate in *Scott* because in *Colo. Cross-Disability Coalition v. Denver* (1) you represented a class of persons, instead of just one plaintiff, and (2) the fee petition was unopposed.

Similarly, Ms. Lucas' claimed hourly rate of $290 per hour is not supported by the cited authority, *Colo. Cross-Disability Coalition v. Colo. Dept. of Health Care Policy and Fin.*, 09-cv-11761.  State District Judge Morris Hoffman's approval of $345 in hourly fees to Kevin Williams in that case does not support Ms. Lucas' claimed rate in *Scott* because (1) Mr. Williams represented a class of persons, instead of just one plaintiff, and (2) Court's reasoning in that case was very much dependent upon the Court's assessment of the complexity of the case at bar and Mr. Williams' skills and experiences.

Second, the amount of requested attorneys' fees for time jointly billed is too high.  It is unreasonable to ask Denver to pay attorneys' fees for conferences and meetings between you and Ms. Lucas or between you, Ms. Lucas and third parties not related to the action.

As we have previously indicated, Denver is open to a negotiated resolution of the matters of fees and costs without involvement of the court.  However, in the absence of your agreement

to substantially reduce the total amount of fees and costs you are seeking to recover, it does not appear that we will be able to resolve this issue without court involvement.

Please contact me if you have any questions.

Regards,
*s/ Joseph Rivera*
Joseph Rivera


cc:    Carrie Lucas (by email)
       Wendy Shea (by email)
       Carol Liang (by email)

EXHIBIT

25

**Amy Robertson**

| | |
|---|---|
| **From:** | Amy Robertson |
| **Sent:** | Tuesday, June 18, 2013 6:54 AM |
| **To:** | 'Rivera, Joseph M. - Department of Law'; Shea, Wendy J. - Department of Law |
| **Cc:** | Carrie Lucas; Raph, Stefanie N - City Attorney Office; Liang, Carol - City Attorney Office; Carrie Lucas (clucas@disabledparentrights.org); Caitlin Anderson |
| **Subject:** | RE: Scott v. CCD (MSK-BNB) -- Correspondence re: fees and costs |

Joe & Wendy -

Your response still does not give us much to go on.  For example, you still have not pointed to any specific billing entry or entries that you believe was/were inappropriate, what you believe appropriate rates to have been, and what the basis is for that conclusion.  You have referred to having an "expert;" which entries does he or she tell you are excessive?  What rates does he/she say are appropriate?

Given that your counteroffer of $150,000 was not supported, all we can do is respond by offering, in the interest of informal resolution, to deduct an additional 5% from our fees, for a demand of $383,000 for fees and costs.  As a cross-check, removing *all* collaborative time -- a vast over-correction -- and adding none of our time since early May yields approximately $386,000 in fees; with costs, the number would be approximately $414,000.  Our current demand of $383,000 for fees and costs is thus very fair, and far less than Judge Krieger is likely to award.

We have started preparing a fee petition and our expert has started work on this so we'll have to wrap this up fairly quickly if we are to resolve it informally.  We remain willing to spend a half-day with Judge Briggs to move things along.

Thanks.

- Amy

**From:** Rivera, Joseph M. - Department of Law [mailto:Joseph.Rivera@denvergov.org]
**Sent:** Thursday, June 13, 2013 10:18 PM
**To:** Amy Robertson
**Cc:** Carrie Lucas; Shea, Wendy J. - Department of Law; Liang, Carol - City Attorney Office; Raph, Stefanie N - City Attorney Office
**Subject:** Scott v. CCD (MSK-BNB) -- Correspondence re: fees and costs

**Please see attached correspondence.**



**Joseph Rivera | Assistant City Attorney**

Denver City Attorney's Office - Litigation Section | City and County of Denver

720.913.3120 Phone | 303.885.0145 Cell

joseph.rivera@denvergov.org

This e-mail and any attachments thereto are intended only for use by the addressee(s) named and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying of this e-mail, and any attachment(s) thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me and permanently delete the original and any copies of the e-mail, any attachment(s) thereto, and any print-out(s).

**EXHIBIT 26**

**CITY AND COUNTY OF DENVER**
Office of Human Resources
201 W Colfax Ave, Dept 412, Wellington E.
Webb Municipal Office Building
Denver, CO 80202
(720) 913-5615
http://www.denvergov.org/jobs

**DENVER** ®
THE MILE HIGH CITY

**INVITES APPLICATIONS FOR THE POSITION OF:**
**Assistant City Attorney - Associate (Litigation)**

*An Equal Opportunity Employer*

**SALARY**
$70,559.00 - $112,894.00 Annually

**OPENING DATE:** 03/28/13

**CLOSING DATE:** 04/15/13

**THE POSITION**

The Denver City's Attorney's Office seeks an **Associate Assistant City Attorney** for the Litigation Section of the Department of Law. An Associate Assistant City Attorney provides intermediate level legal counsel to City officers and employees, and representation in the defense of civil lawsuits in state and federal trial and appellate courts. We seek a litigator with an understanding of municipal government law, a strong commitment to public service, and courtroom experience defending civil rights, personal injury, and property damage lawsuits.

If you are tired of the stresses of billable hours, marketing and client development, and if you are looking for work that is both meaningful and challenging, this is the role for you. We have an active litigation docket and need an eager and experienced attorney to prepare cases for trial and manage cases through an extensive discovery and motion process. The successful candidate will create capacity for other city attorneys by taking on advice and litigation matters as assigned.

The Litigation Section handles all personal injury claims and property damage cases, including civil rights and constitutional claims, brought against Denver, its officers, and employees. The attorneys regularly appear in all federal and state courts. Denver is self-insured, and handles approximately 1,000 claims and 600 cases per year. Under City Attorney Doug Friednash, the Department of Law is putting more emphasis on the Litigation Section taking a principled stand over settling.

The Denver City's Attorney's Office is one of the largest law firms in Colorado, with over 90 attorneys and approximately 90 staff members comprised of paralegals, victim advocates, and other support and supervisory staff members. It may have the most diverse practice of any law firm in Colorado. Clients include the Mayor; the Auditor; the Clerk and Recorder; City Council; and all city agencies, departments, offices, boards, commissions and authorities. The City Attorney's Office is dedicated to providing an inclusive and diverse work environment in which every person has the opportunity to achieve the highest professional and personal development and is accorded the highest degree of dignity and respect.

**JOB RESPONSIBILITIES**

The responsibilities for this position include:

- Under direction of a supervisor, prepares complex cases for trial, such as those at the federal district court, including development of motions and extensive civil discovery, and

represents the City in those proceedings, as well as corresponding appellate briefing and argument.

- Negotiates and prepares settlement agreements, ordinances, resolutions, and other legal documents as necessary.
- Drafts and prepares memoranda, motions, briefs and pleadings to be filed in judicial or quasi-judicial proceedings.
- Conducts or assists with legal research.
- Assists attorneys working in specialized areas with litigation, research and related activities.
- As assigned by the City Attorney, provides City officers and employees with counsel and advice and formal legal opinions on complex matters, in specialized legal areas.
- Manages cases through an extensive discovery and motion practice.
- Performs other related duties as assigned or requested.

For complete job specification click: **Assistant City Attorney-Associate.**

## QUALIFICATIONS

**Required Experience** (must be demonstrated on application/resume):

At least two (2) years of experience as an attorney at law conducting civil litigation at the State or Federal Court levels.

**Preferred Experience** (Must be demonstrated on application/resume):

In addition to the required qualifications listed above, the preferred candidates will be attorneys who have:

- Experience defending against Monell claims;
- Substantial experience in all phases of Federal Court litigation;
- Experience in appellate proceedings;
- substantial experience in government, civil rights, law enforcement and/or Federal Constitutional issues;
- A history of success working in a fast-paced demanding civil litigation practice; and/or
- First or second chair experience for jury trials or trials to a court.

**Licensure and Certification:**

Admission by the Colorado Supreme Court to practice law in Colorado at the time of application.

**Required Education** (must be demonstrated on application/resume):

Graduation from college of law with attainment of a J.D. or an LL.B. degree

## ADDITIONAL INFORMATION

The City and County of Denver values leadership that influences the commitment, ability and willingness of employees to provide quality service to the citizens of Denver.

Denver offers a very competitive benefits package including:

- Medical, Dental & Vision Plans (multiple programs)
- Paid Time Off (combined vacation/sick leave)
- Paid Holidays
- Retirement (Pension Plan!)
- Flex Spending Account
- RTD EcoPass Discounts
- Parking Flex Cash
- Life Insurance; Short-term and Long-term Disability Insurance
- Flex Time

- On-site perks such as dry cleaning, mail service and lobby convenience stores

To apply for this position, please select the apply button at the top of this page, or visit http://www.denvergov.org/jobs.

---

**Classification Title**: #CL0355 Assistant City Attorney - Associate
**Pay Grade:** 814-L
**Full Pay Range**: $70,559 to $112,894 Annually
**Hiring Pay Range**: $75,000 to $90,000 Annually
**Agency**: City Attorney's Office, Department of Law.
**Testing**: 100% Scored Supplemental
**Background Check/Drug Testing:** Candidates must pass a criminal background check, 10 year employment verification and education verification. Additional checks such as credit and drug testing and FBI security screening may be required.
**Probationary Period**: The successful candidate will be required to complete a minimum six month probationary period (benefits will be active during this time) prior to attaining Career Status with the City.
**Recruiters:** TCB/ELM

| RESUMES MAY BE FILED ONLINE AT: | EXAM #53850 08574 |
|---|---|
| http://www.denvergov.org/jobs | ASSISTANT CITY ATTORNEY - ASSOCIATE (LITIGATION) |
| | TB |



**Assistant City Attorney – Associate (Litigation) Supplemental Questionnaire**

* 1. Information provided on the application/resume is used to determine if a candidate meets minimum qualifications. Only information provided at the time of the application being completed will be considered, and additional information that is not listed on either the application or an attached resume **will not be considered** when deciding if a candidate meets or does not meet the qualifications. Applicants are STRONGLY encouraged to include all information and details on their application and attached resumes.

     ❏ I understand and agree that only information provided at the time of my application / resume will be used to determine if I meet the minimum requirements for this position.

* 2. Do you have a J.D. or an LL.B. degree?

     ❏ Yes     ❏ No

* 3. Are you licensed by the Colorado Supreme Court to practice law in Colorado at the time of this application?

     ❏ Yes     ❏ No

* 4. Are you able to report for work in Denver on or before May 13, 2013?

     ❏ Yes
     ❏ No

* 5. If you are a current or former employee, please enter your City and County of Denver Employee ID Number (found in Kronos, in PeopleSoft or on your paycheck stub.) Enter N/A if this doesn't apply.

* 6. The following supplemental questions may be used as a scored evaluation of your knowledge, skills and experience. Be certain that the choices you make and the answers you provide correspond to the information you have provided on your application and resume. Please be as honest and accurate as possible. You may be asked to demonstrate your knowledge and skills in a work sample or during a hiring interview.

     It is highly likely that your answers will be evaluated separately from your application. It is also highly likely that each rater will review only one answer per candidate. Because of this, "See resume" and "See previous answer" are not acceptable answers to these questions.

     By completing this supplemental evaluation, you are attesting that the information you have provided is accurate. Any information you provide may be reviewed by the hiring manager. Any misstatements or falsification of information may eliminate you from consideration or may result in dismissal.

     ❏ Yes I understand and agree
     ❏ No I do not agree

* 7. Do you have at least two (2) years of experience as an attorney-at-law conducting civil litigation at the State or Federal Court levels?

     ❏ Yes     ❏ No

* 8. Describe, in detail, your experience as an attorney at law conducting civil litigation at the State or Federal Court levels. Please include specific job function, name of organization, and dates of employment.

*   9.  The Litigation Section defends Denver in litigation involving a variety of case types. Please indicate if you have at least two (2) years of working practical knowledge in any of the following legal areas:

*Note: This information may be verified in the interview process, by reference checks, or when checking work history.*

❑ Litigating in Federal Court
❑ First or second chair experience for jury trials or trials to a court
❑ Handling appellate proceedings
❑ Colorado Government Immunity Act (CGIA)
❑ Americans with Disabilities Act (ADA)
❑ 42 U.S.C. § 1981
❑ 42 U.S.C. § 1983 involving First Amendment issues
❑ 42 U.S.C. § 1983 involving Fourth Amendment issues
❑ 42 U.S.C. § 1983 involving Eighth Amendment issues
❑ Monell claims and defenses
❑ None of the above

*   10.  Provide an overview of your experience conducting civil litigation at the State and Federal Court levels. Indicate how many years of experience you have with this by providing your role, the dates and your employer/firm. Then describe one case you personally handled, providing specific examples of your duties, and the outcome of the case. If none, indicate N/A.

*   11.  Describe your overall experience serving as lead counsel in jury trials. Then describe a specific case, discussing your involvement and the decision. Include the dates, your title, the name of your employer/firm, and the names of the opposing counsel. If possible, provide examples of how you wrote jury instructions. If no experience, indicate N/A.

*   12.  Describe your experience litigating in Federal Court and experience in government, civil rights, law enforcement and/or Federal Constitutional issues. Indicate how many years of experience you have with this by providing dates, your title and the name of your employer/firm. Then describe one such matter, providing a specific example and the outcome. If none, indicate N/A.

* Required Question

**EXHIBIT 27**

| Name | Title | Identified as City's trial witness | City's 30(b)(6) witness | Disclosed as having contact with Plaintiff | City's Expert | Date | Length | Number of attorneys for Plaintiff | Number of attorneys for Defendant |
|---|---|:-:|:-:|:-:|:-:|---|---|:-:|:-:|
| **Depositions noticed by Plaintiff** | | | | | | | | | |
| Brain Henry Govi | Sheriff's Deputy | | | ✔ | | 04/08/13 | 0:17 | 2 | 1 |
| Delilah Lewis | Sheriff's Deputy | | | ✔ | | 04/08/13 | 0:17 | 1 | 1 |
| Dean Howard | Sheriff's Deputy | | | ✔ | | 04/03/13 | 0:28 | 1 | 1 |
| David Conn | Sheriff's Deputy | | | ✔ | | 03/26/13 | 0:30 | 1 | 2 |
| Michael Jordan | Sergeant, Sheriff Dep't | | | ✔ | | 02/19/13 | 0:34 | 1 | 1 |
| Ann Topliff | Interpreter (independent) | ✔ | | | | 02/22/13 | 0:36 | 1 | 1 |
| Lawrance Austin | Retired Sergeant | | | ✔ | | 02/19/13 | 0:43 | 1 | 1 |
| Antoinette Gallegos | Sheriff's Deputy | | | ✔ | | 03/26/13 | 1:02 | 1 | 2 |
| Roger Ladd | Sheriff's Deputy | | | ✔ | | 02/19/13 | 1:02 | 1 | 1 |
| Frank Gale | Major, Sheriff Dep't | | ✔ | | | 10/16/12 | 1:10 | 1 | 1 |
| Mark Yamashita | Probation Officer | ✔ | | | | 04/08/13 | 2:31 | 1 | 1 |
| Sandra Gabbard | Defendant's expert audiologist | | | | ✔ | 12/12/12 | 2:32 | 1 | 2 |
| John Romero | Captain, Sheriff Dep't. | | ✔ | | | 10/16/12 | 3:09 | 1 | 2 |
| Roy Line | Sergeant, Sheriff Dep't | ✔ | | | | 04/03/13 | 3:20 | 1 | 1 |
| Lorrie Kosinski | Director, Office of Sign Language Services | ✔ | ✔ | | | 10/31/12 | 7:07 | 2 | 1 |
| Brenda Schick | Defendant's communications expert | | | | ✔ | 03/12/13 | 7:27 | 2 | 1 |
| | | | | | | | | | |
| **Depositions noticed by Defendant** | | | | | | | | | |
| Jean Andrews, Ph.D. | Plaintiff's expert | | | | | 03/29/13 | 7:50 | 2 | 2 |
| David Gill | Probation Officer | | | | | 03/07/13 | 1:59 | 1 | 1 |
| James Schmid | Probation Officer | | | | | 03/07/13 | 1:34 | 1 | 1 |
| Becky Lea Scott | Plaintiff's mother | | | | | 02/26/13 | 3:32 | 1 | 1 |

**EXHIBIT 28**

---

**Amy Robertson**

| | |
|---|---|
| **From:** | Shea, Wendy J. - Department of Law [Wendy.Shea@denvergov.org] |
| **Sent:** | Wednesday, February 20, 2013 9:32 AM |
| **To:** | Amy Robertson |
| **Cc:** | Carrie Ann Lucas; Caitlin Anderson; Jennifer Elstran; Rivera, Joseph M. - Department of Law; Liang, Carol - City Attorney Office |
| **Subject:** | RE: Sgt. Jordan's deposition |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Amy:

As discussed, this will confirm that the City will pay for the reporter appearance fee for Sgt. Jordan's deposition and further agrees that the deposition does not count toward the number of depositions Plaintiffs have been permitted to take.  We will also confirm with Deputy Gallegos that she actually communicated with Major Scott (as opposed to just completing a portion of the form) prior to her deposition on Friday  Additionally, as we discussed, we are currently in the process of reviewing the City's interrogatory response regarding Denver employees who communicated with Major Scott and we will amend/supplement the response by Friday so that you can determine if there is anyone else who you may want to depose concerning such communications.

I look forward to speaking with you tomorrow at 3:00 to discuss other outstanding discovery issues.

Thanks!

Wendy J. Shea
Assistant City Attorney
Litigation Section
Denver City Attorney's Office
201 W. Colfax Ave., Dept. 1108
Denver, CO 80202
Phone:  (720) 913-3112
Fax: (720) 913-3190

This e-mail and any attachments thereto are intended only for use by the addressee(s) named herein and may contain legally privileged or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachments thereto is strictly prohibited. If you have received this e-mail in error, please notify me immediately at 720-913-3112 and permanently delete the original and destroy any copies or printouts. Thank you.

**From:** Amy Robertson [mailto:ARob@foxrob.com]
**Sent:** Tuesday, February 19, 2013 9:42 AM
**To:** Shea, Wendy J. - Department of Law; Rivera, Joseph M. - Department of Law; Liang, Carol - City Attorney Office
**Cc:** Carrie Ann Lucas; Caitlin Anderson; Jennifer Elstran
**Subject:** Sgt. Jordan's deposition

Counsel:

We noticed Sgt. Jordan's deposition because the City identified him as someone who had had contact with Major Scott, and had filled out the General Inmate Information form at DENVER000539-41.

> The City's 11/09/12 Sixth Supplemental Response to Plaintiff's First Discovery states, "please find below . . . DSD deputies who communicated with Plaintiff. . . . Michael Jordan · 5/23/11; Bates Nos. 539-541." *Id.* at 2.

> The City's 12/14/12 Response to Court Order notes that the order requires the City to "'identify each person who had direct contact with the plaintiff and who will be called as a witness at trial by the defendant to testify that the plaintiff had effective communication skills,'" *id.* at 1, quoting ECF No. 58. The City attached an Exhibit A which it described as "a listing of those law enforcement personnel meeting each requirement set out by the Court's Order." *Id.* Sgt. Jordan was listed in Exhibit A.

It was for these reasons that we noticed Sgt. Jordan's deposition. At today's deposition, we learned that Sgt. Jordan did not prepare DEN000539, and had never met Mr. Scott. We also learned that the City may have known this as long as six weeks ago, but at the very least last Friday. We learned further that while there is a screen shot that would have permitted Sgt. Jordan to identify who in fact prepared DENVER000539, the City did not provide that screen shot to us, though Sgt. Jordan has stated that he could look into the JMS computer system now and be able to tell. Based on the practice at the time, he believes it was Dep. Gallegos.

Based on the above, we make the following requests:

> ➤ That the City correctly identify the person who completed DENVER000539 before Dep. Gallegos's deposition on Friday.

> ➤ That Sgt. Jordan's deposition not count against the total number of depositions Plaintiff is permitted to take.

> ➤ That the City pay the costs associated with Sgt. Jordan's deposition.

Please let us know whether you agree to these three measures before close of business Thursday, so we can make that part of any motion we file with Judge Boland.

Thank you.

Amy F. Robertson
Fox & Robertson, PC
104 Broadway
Suite 400
Denver, CO 80203
Voice: 303.595.9700
TTY: 877.595.9706
Fax: 303.595.9705
Web: www.foxrob.com
Twitter: @FoxRobLaw

EXHIBIT

29

**Amy Robertson**

| | |
|---|---|
| **From:** | Shea, Wendy J. - Department of Law [Wendy.Shea@denvergov.org] |
| **Sent:** | Thursday, March 14, 2013 2:46 PM |
| **To:** | Amy Robertson |
| **Cc:** | Liang, Carol - City Attorney Office; Carrie Ann Lucas |
| **Subject:** | RE: Additional City depos |

Hi Amy:

I apologize and I will immediately amend my March 6th letter if you would like me to do so. However, at the time it was sent I was relying upon information provided to me and I had not had the chance to speak to everyone identified in the letter.  When contacting individuals to determine their availabilities, I learned that Deputy Gallegos, Deputy Lewis and Deputy Conn do not have a specific recollection of Mr. Scott.  Including Deputy Conn in the letter was a result of my own error, as I think previously advised you that he did not have a specific recollection of Scott and then still erroneously included him in my letter.

As a result, I doubt you want to depose any of these individuals.  If you still do, please let me know. Everyone else on the list **does** have a specific recollection of Mr. Scott.

Again, my sincere apologies regarding this error.  Please let me know who else you would like to depose.  In the meantime, I will get dates for the remaining witnesses and provide them to you as soon as possible.


Wendy J. Shea
Assistant City Attorney
Litigation Section
Denver City Attorney's Office
201 W. Colfax Ave., Dept. 1108
Denver, CO 80202
Phone:  (720) 913-3112
Fax: (720) 913-3190

This e-mail and any attachments thereto are intended only for use by the addressee(s) named herein and may contain legally privileged or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachments thereto is strictly prohibited. If you have received this e-mail in error, please notify me immediately at 720-913-3112 and permanently delete the original and destroy any copies or printouts. Thank you.

**From:** Amy Robertson [mailto:ARob@foxrob.com]
**Sent:** Thursday, March 14, 2013 2:14 PM
**To:** Shea, Wendy J. - Department of Law
**Cc:** Carrie Ann Lucas; Caitlin Anderson; Rivera, Joseph M. - Department of Law; Jennifer Elstran; Liang, Carol - City Attorney Office
**Subject:** RE: Additional City depos

Hi, Wendy -

We would like half a day each for Line, Yamashita, Clague, Koonce and Dougherty, and two hours each for Conn, Gallegos, Lewis, Howard, and Govi.

Here are our available dates:

4/1 afternoon
4/3
4/8
4/9 starting at 10:00
4/11
4/12
4/15

Thanks.

- Amy

**From:** Shea, Wendy J. - Department of Law [mailto:Wendy.Shea@denvergov.org]
**Sent:** Thursday, March 14, 2013 9:15 AM
**To:** Amy Robertson
**Cc:** Carrie Ann Lucas; Caitlin Anderson; Rivera, Joseph M. - Department of Law; Jennifer Elstran; Liang, Carol - City Attorney Office
**Subject:** RE: Additional City depos

Hi Amy:

We are working on getting dates of availability; however, I need to know how much time you think you need for each deponent for scheduling purposes.

Thanks.

**From:** Amy Robertson [mailto:ARob@foxrob.com]
**Sent:** Wednesday, March 13, 2013 6:34 AM
**To:** Shea, Wendy J. - Department of Law
**Cc:** Carrie Ann Lucas; Caitlin Anderson; Rivera, Joseph M. - Department of Law; Jennifer Elstran; Liang, Carol - City Attorney Office
**Subject:** Additional City depos

Hi, Wendy –

Having reviewed the City's revised response to Interrogatory 12 and your letter of March 6, we would like to depose the following people:

1. David Conn
2. Antoinette Gallegos
3. Delilah Lewis
4. Dean Howard
5. Brian Govi
6. Roy Line II
7. Mark Yamashita
8. John Clague
9. Phazaria Koonce
10. Jennifer Gafford/Daugherty

By my count, we have six remaining depos, and numbers 6 through 10 above do not count against our total.  This leaves one deposition, which we will determine at a later date.  We have decided not to reopen Capt. Romero's deposition.

Could you please get a range of available dates from each of these folks?  Thanks.

- Amy

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**EXHIBIT**

**30**

Civil Action No. 12-cv-00053-MSK-BNB

_____

DEPOSITION OF:  LORRIE KOSINSKI - October 31, 2012

_____

MAJOR JON MICHAEL SCOTT,

Plaintiff,

v.

CITY & COUNTY OF DENVER,

Defendant.

_____

            PURSUANT TO NOTICE, the deposition of
LORRIE KOSINSKI was taken on behalf of the Plaintiff
at 104 Broadway, Suite 400, Denver, Colorado 80203, on
October 31, 2012, at 10:10 a.m., before Darcy Curtis,
Registered Professional Reporter and Notary Public
within Colorado.

Scott v. City & County of Denver  LORRIE KOSINSKI                    10/31/2012

```
                                                            Page 2

 1                    A P P E A R A N C E S

 2    For the Plaintiff:

 3              AMY F. ROBERTSON, ESQ.
                Fox & Robertson, P.C.
 4              104 Broadway, Suite 400
                Denver, Colorado 80203
 5
                CARRIE ANN LUCAS, ESQ.
 6              The Center for Rights of Parents with
                  Disabilities
 7              P.O. Box 756
                Windsor, Colorado 80550
 8

 9    For the Defendant:

10              JOSEPH M. RIVERA, ESQ.
                Denver City Attorney's Office
11              Litigation Section
                201 West Colfax Avenue, Department 1108
12              Denver, Colorado 80202

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Scott v. City & County of Denver LORRIE KOSINSKI                    10/31/2012

Page 62

1    had a sign language interpreter in the process and a

2    lot of this information is similar to what was

3    interpreted to him.

4           Q.   Well, let me ask you:  Is it your view

5    that if the city provided an interpreter to Mr. Scott

6    on one occasion that that would be sufficient for him

7    to understand any similar documents or information he

8    might receive without a sign language interpreter

9    going forward?  In your view, is that sufficient?

10          A.   If we're talking about Mr. Scott, he's a

11   very savvy player.  He knows he can request a sign

12   language interpreter.  If he wants to read this

13   document and sign it, he can do that.

14          Q.   If he wants to read this document and

15   sign it, he can read it?

16          A.   He can read it.  He can peruse it.  He

17   can assume he understands it.  He can ask for a sign

18   language interpreter.  If he doesn't get one, he

19   doesn't have to sign this.  If he doesn't understand

20   the document, he doesn't have to sign it.

21          Q.   Let me go back to my original question,

22   though, which was:  Is it your view that once an

23   individual has had a sign language interpreter during

24   one interaction with the sheriff's department that

25   after that the sheriff's department does not need to

**EXHIBIT**

**31**

# Audiologic Report
Patient: Major Jon Michael Scott
DOB: 12-4-1984
Test Date: 10-23-12
Report Date: 10-29-12

**Background:** Major Scott was evaluated at the University of Colorado Hospital (UCH) by Sandra Gabbard, PhD and Virginia Lupo, MA at the request of Joseph Rivera from the Denver City Attorney's Office. He was accompanied by a DOC guard and his attorney.

Major was cooperative, friendly and polite. When he arrived at the clinic, he was presented with the standard UCH consent-to-treat and HIPPA forms to sign. He was asked by the front desk staff using oral English if he understood the paperwork and if he had any questions. He responded that he understood and had no questions. He did not ask for an interpreter and it was the impression of Phoebe Garcia that he understood everything she said to him. He gave no indication that he was uncomfortable without an interpreter. At the end of the assessment, the interpreter reviewed the documents with him in sign language and he said he understood.

A sign language interpreter provided by the UCH was used to communicate with Major during the entire interview and assessment by the audiologists. On several occasions, the interpreter rephrased the information she was interpreting when he appeared not to understand.

**History:** Major reported he was born with hearing but became deaf at the age of 2 when he became ill and was in the hospital for about a month. He reported beginning to talk before he lost his hearing and that his hearing loss decreased over time. He has a sister who is also deaf. He wore hearing aids as long as he can remember as a child, but did go without hearing aids for a few years as a teenager and young adult. He reported being educated in a regular school until high school when he attended a school for the deaf and used sign language. He reported many years of speech therapy and that he still uses his voice to communicate but that some people cannot understand him very well. He did not use his voice to communicate with the audiologists.

Major reported wearing the current hearing aid for his left ear (Phonak Naida III UP) for the past three years and that he was just fit with the current aid for the right ear (Phonak Milo Plus UP). Both ear molds he is currently using were fit with the new hearing aid for the right ear. He described ear pain, worse in the right ear and that he had an ear infection the week prior to the evaluation. He wears his hearing aids all day as well as sleeps with them in. He reported he cannot understand speech very well with his hearing aids but can hear sounds in his environment, including someone calling his name loudly. He says he likes the hearing aids but would like smaller ear molds.

Major denied having ringing in his ears or tinnitus but did report some intermittent imbalance.

**Results:** Otocopy revealed cerumen deep in the left ear canal and non-occluding cerumen in the right ear canal.  Following cerumen removal by Dr. Herman Jenkins, the left ear canal was visualized.  Dr. Jenkins ruled out an active ear infection in his physical examination of both ears.

Pure tone air conduction testing was performed using conventional insert ear phones in a sound room meeting ANSI standards.  A patient response button was used by the patient to respond when he heard a sound.  Responses were obtained at 125, 250 and 500 Hz in the right ear and at 125, 250, 500 and 750 Hz in the left ear.  There were no responses to the loudness limits of the audiometer above these frequencies.   The thresholds obtained were in the serve-profound range of hearing loss

A conventional bone conduction oscillator and a patient response button was used to obtain bone conduction thresholds.  The bone conduction oscillator was placed on the right mastoid and thresholds were obtained at 250 Hz at 55 dB and at 500 Hz at 70 dB.  The patient reported he may have been feeling and not hearing the tones (see attached audiogram)

The results of pure tone air and bone conduction testing revealed a severe to profound sensorineural hearing loss bilaterally.

Speech awareness thresholds were obtained because Major was unable to repeat spondee words necessary to obtain speech reception thresholds.  He used a patient response button to signal when he heard the speech.  The results were 105dB HL for each ear.  This is consistent with good agreement between the SAT and the pure tone averages which is consistent with good test reliability.

Unaided speech recognition testing cold not be obtained due to intensity limitations of the audiometer.

Tympanograms were obtained bilaterally and revealed normal type A responses in each ear.

Aided testing was obtained with Major wearing both behind-the-ear hearing aids on use settings.  Hearing aids were not adjusted by the audiologists at any time during the evaluation.  An aided speech awareness threshold was obtained at 55db HL and aided pure tone thresholds were obtained in sound field at 250, 500, 750 and 1000 Hz.   He used a patient response button to signal when he heard the sounds. Results are consistent with hearing in the moderate-severe hearing range in the low and mid frequencies with use settings on his current hearing aids.  There is good agreement between the SAT and the pure tone thresholds which is consistent with good test reliability.

Aided speech recognition testing was obtained with Major wearing both hearing aids on use settings.  The Four-Choice Spondee Test was completed with the speech stimuli at 60 dB HL and Major facing the speaker.  This test is a series of two-syllable words from a recorded voice.  Major was instructed to guess if he was not sure of the words.  His score was 12/20 or 60% correct.  This is above the chance score of 25% correct

HINT sentence testing was also obtained at 60 dB HL in a binaural aided condition with Major facing the speaker.  He was instructed to sign any words he heard in the sentences that were presented from a recorded voice.  He responded several times that he could not understand and that the words were too fast.  His score was 3/106 or 3% correct.

The current programming setting for both hearing were evaluated and read out from the Phonak programming software.  The aids were evaluated using probe-microphone measurements and NAL-NL1 targets.  Both hearing aids were below the target responses.  The hearing aid worn on the left was measuring significantly more gain than the aid on the right ear when analyzed using 2 cc coupler measurements.  The average gain of the right Milo hearing aid was measured to be 46 dB with 50 dB input and the average gain of the left Naida aid was measured to be 69 dB with 50 dB input.

**Impressions:**
1. Major has a severe-profound sensorineural hearing loss and he is not able to understand speech clearly while using power behind-the-ear hearing aids.  He uses visual input like speechreading/lipreading and contextual clues to improve his understanding of speech.   When given a speech understanding task with a small number of options, like the Four-Choice Spondee Test, he was able to score above chance.  This demonstrates an ability to hear some of the sounds in the words which allows him to narrow down the choices to answer correctly a significant percentage of time.  Communication is often done in an environment of contextual clues.  When a listener like Major has an idea of what the topic of the communication is they have a much better chance of hearing some of the sounds and can use that information to significantly improve their understanding.  Major understood only 3% of the HINT sentences (with no contextual clues) but understood 60% of the words in the Spondee Test.
2. Major presented to the UCH clinic as a person wearing hearing aids who appears to understand through listening and speechreading/lipreading.  He did not seem confused and did not ask for an interpreter when interacting with UCH staff who have experience communicating with individuals with hearing loss.  He seemed comfortable communicating both receptively and expressively.  The only way someone communicating with Major would know that he is not understanding or needs written information or an interpreter is if he communicates that.  He did not communicate that to the UCH front desk staff, even they were well aware that he has a hearing loss.

3.  In my experience, successful communication with someone with the audiometric profile and educational experience consistent with that of Major Scott is typically done through a combination of listening, the use of visual clues like speechreading/lipreading which includes facial expression, contextual clues which includes knowing or anticipating the topic of the discussion and may also include supplementing with written words, gesture or sign language.  It would be helpful to my conclusions to review the assessment of Major's reading ability, his language level and his sign language skills, other assessments and any other evaluations conducted on major regarding his ability to communicate.

Sandra Abbott Gabbard, PhD, CCC-A
Clinical Audiologist and Director of Audiology
University of Colorado Hospital

EXHIBIT

32

Brenda Schick, Ph.D.
4153 Amber Street
Boulder, CO 80304
303 818-8515

January 28, 2013

Joseph Rivera
Assistant City Attorney
Litigation Section
Denver City Attorney's Office
201 West Colfax Avenue, Dept. 1108
Denver, Colorado 80202

Re:  **Major Michael Jon Scott v. City and County of Denver**

Dear Mr. Rivera:

At your request, I have reviewed the opinion Jean Andrews provided concerning Mr. Scott's ability to effectively communicate and conducted my own independent evaluation regarding his communication abilities.  This report summarizes my findings and conclusions.

**<u>Purpose</u>:**

My goal was to develop an understanding of Mr. Scott's overall range of communication skills, not just a description of his abilities in various different languages and modalities.  For all hearing and deaf and hard of hearing ("DHH") individuals communication involves a broad range of cues and information that our brains piece together to form communication.  This includes language (the rule-governed use of symbols and words), but it can also include information we obtain from a very wide variety of other cues, including the following non-exhaustive list: facial expression, body movements, gestures, visual information from mouth movements, eye gaze, body language, tone of voice, speed of talking, emphasis on words, turntaking, etc.  All hearing people use a variety of cues to develop an understanding of the communicative intent of another individual.  For example, most hearing adults at a noisy restaurant need to look at the speaker's face.

American Sign Language, or ASL, is a language that was developed by deaf people beginning more than 200 years ago.  Through substantial linguistic research, we know that ASL, like all spoken languages in the world, is a rule-governed linguistic system.  Like spoken languages, sign languages typically differ across the world.  For example, Japanese Sign Language is different from ASL in that it has its own vocabulary and linguistic rules.

What is typically called ASL has a grammatical structure different than spoken English. However, because DHH people exist within a hearing world, many DHH individuals sign in a more English-like grammar.  It is not spoken English on the hands but the syntax, or order of the words, resembles English more than what is often called ASL.  Most highly educated DHH

individuals, such as those with Ph.D.s, will use a range of signing, from being English-like to more ASL-like.  It is not a given fact that DHH individuals use only ASL or do not understand English.  However, this English-like signing never includes English grammatical devices such as inflectional word endings (e.g., work+ed, work+ing are signed as "work finish" and "work-continuously"), and it doesn't include words that are used in the English tense system (e.g., "have been work+ing" is signed as "finish work-continously).  There are ASL grammatical devices that are used instead.   That is, more English-like signing is really a mix of ASL and English grammar.

Given this, communication skills in DHH people are typically best described as a range of skills in both English and ASL.  Almost all DHH individuals have grown up with substantial exposure to some form of English in the schools, and a minority of them have grown up with exposure to ASL.  It is rare to find a deaf individual who has grown up only exposed to ASL.

The goal of my evaluation was to determine the range of communication skills of Mr. Scott in speech, spoken communication, English-like signing, and ASL.  During the in-person evaluation,I did not administer standardized reading tests to Mr. Scott because I thought that there was sufficient evidence in his school reports to determine his reading ability  Moreover, standardized reading tests assess reading that is very decontextualized.  That is, it assesses independent reading skills for texts that are about events and situations that many individuals have not experienced.  Mr. Scott's standardized reading scores in school records indicate that his independent reading skills range from first to second grade.  However, these tests of independent reading do not represent how an individual may read in a context where they have background knowledge from experience, they have the vocabulary, and they have another individual guiding them through reading with conversational support.  All individuals, hearing and deaf, can typically read and understand more sophisticated text when provided interactive support.  To ascertain his level of understanding, throughout the evaluation, I presented Mr. Scott with written materials, typically regarding topics that he had experience with, with interactive support, which I will describe later.

Prior to the examination, I confirmed that Mr. Scott was wearing his hearing aids on both ears, and he agreed that both batteries were properly functioning.  His hearing aids were recently evaluated in October 2012 and were also in working order at that time.  He was aware when there were announcements over the speaker system and reacted when they happened, but when I asked, he said he could not understand them.

**Background for In-Person Evaluation of Mr. Scott:**

Both of my parents were profoundly deaf.  Both were highly involved in the Deaf Community in Indianapolis, Indiana.  For example, my parents went to the deaf club nearly every Friday night throughout my childhood, and my siblings and I spent countless hours there.  I also frequently interpreted for my parents and even for friends of my parents, starting when I was in first grade. I am what is termed a "native signer," an individual who learned ASL from birth.  I also have mentored three deaf doctoral students, presented scientific lectures in ASL, and taught graduate courses in ASL.  I am a former certified interpreter, and I occasionally interpret for deaf colleagues.

I conduct research in language skills of adults and children who use sign language , both hearing individuals and those with hearing loss.  About two decades ago, I developed an assessment instrument to rate language and interpreting skills in sign language interpreters who work in the educational setting (Educational Interpreter Performance Evaluation).  I received federal funding from the Office of Education to introduce this tool nationwide.  This instrument is now required for licensure or certification in about 35 states and is an avenue for national certification through the Registry of Interpreters for the Deaf.  This tool has been used to evaluate the skills of more than 15,000 individuals in the past decade alone.  In addition, I have developed several tests of ASL skills in young children; two are being used in a federally funded research center to examine reading skills in young children who have a hearing loss.

In preparation for my in-person evaluation of Mr. Scott, I reviewed the documents listed in Appendix A.  Based on that review, I learned that Mr. Scott is currently 28 years old.  He was educated in the Ponca Public Schools until about age 15 when he transferred to the Oklahoma School for the Deaf.  He was at the Oklahoma School for the Deaf for the fall semester of 2000.  In the spring semester, he was under the administration of the Ponca School District but educated in the Youth Habilitation Services in a regular education classroom with the use of personal hearing aids and an interpreter.  In March, 2002, he returned to the Oklahoma School for the Deaf and graduated in May 2003.  Most of his education has been in the public school system with hearing students.  It appears that his education at the Oklahoma School for the Deaf was less than four semesters and it is not an educational program that uses ASL for classroom communication when he was there, as stated in multiple annual Individualized Education Program (IEP) documents (which are documents required by federal law in special education).

His educational records, mostly from the Oklahoma School for Deaf, indicate that Mr. Scott participated in speech therapy until age 18, when he declined services (POSD000044).  His speech goals at that time included improving his speechreading and working on speech skills that were consistent with an individual who had some intelligible speech (that is, working on sounds and sound combinations that are more advanced).

Many of his reports indicate that he became deaf at two years of age, but it appears that this was actually the age where his hearing loss was first detected.  At age 14, the youngest age where there is an audiogram in his records, Mr. Scott was not deaf.  He had hearing in the more severe to profound range and his records indicate that even without hearing aids, he could discriminate speech without visual cues, an indication that he was hearing a great deal of speech information (average speech discrimination skills = 45%).  With hearing aids, Mr. Scott's hearing was in the range of a moderate loss, and he demonstrated good speech discrimination (58%).  Speech discrimination is typically tested with isolated words, with no visual cues, through hearing alone.  His hearing thresholds with hearing aids and his speech discrimination scores show that Mr. Scott was not profoundly deaf during adolescence.   By 2010, Mr. Scott was profoundly deaf (PCSHL000002).

It is notable that throughout Mr. Scott's records, there is evidence that he has used hearing aids and prefers to use hearing aids to the present time.  He asked to keep them during intake on 10/21/2010 (Denver 000036), where he wrote, "I'm deaf – may keep hearing aids."  At age 18,

Page 1

EXHIBIT

33

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-00053-MSK-BNB

_____

DEPOSITION OF:  BRENDA S. SCHICK, PH.D.
                March 12, 2013 - Volume I
_____

MAJOR JON MICHAEL SCOTT,

Plaintiff,

v.

CITY & COUNTY OF DENVER,

Defendant.

_____

         PURSUANT TO SUBPOENA, the deposition of
BRENDA S. SCHICK, PH.D. was taken on behalf of the
Plaintiff at 355 Eastman Park Drive, Suite 200,
Windsor, Colorado 80550, on March 12, 2013, at
10:24 a.m., before Sandra L. Bray, Registered
Diplomate Reporter, Certified Realtime Reporter, and
Notary Public within Colorado.
```

Page 2

```
 1                    A P P E A R A N C E S

 2    For the Plaintiff:

 3              CARRIE ANN LUCAS, ESQ.
                The Center for Rights of Parents with
 4                Disabilities
                355 Eastman Park Drive
 5              Suite 200
                Windsor, Colorado 80550
 6
                AMY ROBERTSON, ESQ.
 7              Fox & Robertson, P.C.
                104 Broadway
 8              Suite 400
                Denver, Colorado 80203
 9

10    For the Defendant:

11              JOSEPH M. RIVERA, ESQ.
                Denver City Attorney's Office
12              Litigation Section
                201 West Colfax Avenue
13              Department 1108
                Denver, Colorado 80202
14

15    Also Present:

16              Jennifer Eltran

17

18

19

20

21

22

23

24

25
```

Page 38

1    somebody walked through this document with him, yes, I

2    think he probably would be able to understand.

3         Q.    And who went through this in an

4    interactive way with him?

5         A.    I am not sure.

6         Q.    Do you know -- how do you know that

7    there was an interactive process to go through this

8    document?

9         A.    When I toured the jail, every single

10   person I met, I asked them, you know, how did you go

11   through this document, and they all said they talked

12   their way through that.  Nobody said that they would

13   just give this document to them.  And on many

14   occasions, I would even pick out, you know, a specific

15   topic, like failure to adhere to the electronic

16   monitoring program schedule, how would you communicate

17   that, and ask them specifically how you would say

18   that.  When I heard they were to say, it was clearly

19   in much more simple language and with gestures and

20   things like that.

21          So I never talked with anybody in the

22   jail who -- I never asked them, "Did you just give

23   this document to them to read?"  I asked, "How did you

24   go through this document?"  And everybody volunteered

25   that they would work through this document with the

Page 39

1    individual to the point of understanding.

2            Q.    Who is "everybody"?

3            A.    Oh, I talked with people at the intake

4    desk and all of these different parts of this jail

5    intake.  I talked with people where they took

6    photographs of people.  I talked with people in the

7    medical, the nurse's office.  I talked with people at

8    the classification stations.  So I talked with people

9    at each of those stations, and they explained to me

10   what it is they did.  And so if they said to me there

11   was a document that somebody was handed, I'd say, "How

12   would you -- how would you work through this document?

13   How would you handle this document?"

14           Q.    Did you speak with the officer who went

15   through this document with Mr. Scott?

16           A.    I don't think so.

17           Q.    Okay.  Could --

18           A.    I don't know that.

19           Q.    Is it your opinion that if somebody did

20   not go through an interactive process, that Mr. Scott

21   could understand this document?

22                 MR. RIVERA:  Objection, calls for --

23   lack of foundation, calls for speculation.  Go ahead.

24           A.    Could you restate that question?

25           Q.    (BY MS. LUCAS)  Yes.  It's not a good

Page 41

1          A.   Again, I think that if it were gone

2     through with him in an interactive manner, he would

3     have understood it.  I asked him questions similar to

4     this when I was doing my interview with him, and he

5     clearly understood them.

6          Q.   **When you asked him those questions, were**

7     **you asking him using sign language?**

8          A.   Yes, I was, but I was using more

9     English-like -- well, actually, to be honest, some of

10    these I presented in English print first, and

11    Mr. Scott would sometimes answer appropriately.  So he

12    did actually understand some of these things through

13    reading a little.

14         Q.   **Could he understand 100 percent of these**

15    **things?**

16              MR. RIVERA:  Objection; calls for

17    speculation, lack of foundation.

18         A.   I don't know.  I didn't test him.

19              MS. LUCAS:  I'm going to mark this next

20    document, which is Denver 000514 through 516, as

21    Exhibit 69.

22              (Deposition Exhibit 69 was marked.)

23              MS. LUCAS:  And then a second similar

24    document as Exhibit 70, which is Denver 000548 through

25    551.

Page 42

1              (Deposition Exhibit 70 was marked.)

2         Q.   (BY MS. LUCAS)  Did you review these two

3    documents?

4         A.   Are these different?

5         Q.   They have different numbers, and they

6    have different dates that they were signed.

7         A.   Oh, okay.  Thank you.  Yes, I reviewed

8    these, at least one of them.

9         Q.   And is it your opinion that Mr. Scott

10   can read and understand these two documents?

11        A.   I really don't know.  I didn't assess

12   that.

13             MS. LUCAS:  This is Denver 000904

14   through 909.  Mark this as Number 71.

15             (Deposition Exhibit 71 was marked.)

16        Q.   (BY MS. LUCAS)  Did you review this

17   document?

18        A.   Yes, I did.

19        Q.   Is it your opinion that Mr. Scott --

20   that Mr. Scott can understand this document if he

21   reads it?

22             MR. RIVERA:  Objection, vague.

23        A.   Again, from everything that everybody --

24   you know, I heard from everybody and everything -- you

25   know, when I asked them to show me how they would read

Page 43

1    this, they would actually render this in more

2    understandable language.  So, you know, reading

3    something on your own and reading something with

4    interactive help are two different things.  So I'm not

5    sure.  Are you meaning read it on his own or read it

6    with interactive help?

7            Q.    I'm asking if he read it on his own.

8            A.    I have no idea if he read it on his own.

9            Q.    If he can read it on his own?  I'm

10   sorry.  I didn't understand what you said.

11           A.    Yeah, I don't know.

12           Q.    Did you observe an actual interactive

13   process, as you understand it, actually occur with a

14   prisoner?

15           A.    No.

16                 MS. LUCAS:  This next document will be

17   marked as Exhibit 72, which is Denver 000947, which is

18   an administrative findings and penalties.

19                 (Deposition Exhibit 72 was marked.)

20           Q.    (BY MS. LUCAS)  Did you review this

21   document?

22           A.    Yes, I did.

23           Q.    Is it your opinion that Mr. Scott can

24   read and understand this document?

25                 MR. RIVERA:  Objection, vague.

Page 45

1             MR. RIVERA:  Yes.  Yes, I would prefer

2     that.

3             MS. LUCAS:  Let me take that back.

4             THE DEPONENT:  Because this is the same

5     document as this one.

6             MS. LUCAS:  Let me see.  I think this is

7     just one page.  I'm going to ask just about 949.

8             MR. RIVERA:  Perfect.  We're good to go.

9             (Discussion off the record.)

10            (Deposition Exhibit 73 was remarked.)

11        **Q.   (BY MS. LUCAS)  Did you review this**

12    **document?**

13        A.   Yes, I did.

14        **Q.   And this is a Denver Sheriff Offense in**

15    **Custody Complaint; is that correct?**

16        A.   Yes, that's what I have here.

17        **Q.   Is it your opinion that Mr. Scott can**

18    **read and understand this entire document?**

19            MR. RIVERA:  Objection, vague.

20        A.   I don't know.

21            MS. LUCAS:  I'm going to hand you a

22    document that's -- we'll mark this as Number 74, and

23    it's a Denver Sheriff Department Inmate Handbook.

24            (Deposition Exhibit 74 was marked.)

25        **Q.   (BY MS. LUCAS)  Did you review this**

 1    document?

 2         A.   Yes, I did.

 3         Q.   And is it your opinion that Mr. Scott

 4    can read and understand this entire document?

 5              MR. RIVERA:  Objection, vague.

 6         A.   I think he would be challenged by this

 7    document, but I think many hearing individuals would

 8    be challenged by this document.

 9              MS. LUCAS:  Let me hand you what's been

10    marked -- what's Bates-numbered Denver 000042, which

11    will be marked as Exhibit 75.

12              (Deposition Exhibit 75 was marked.)

13         Q.   (BY MS. LUCAS)  It's a counseling form

14    regarding sexual assault.  Did you review this?

15         A.   Yes, I did.

16         Q.   And is it your opinion that this Exhibit

17    Number 75 that Mr. Scott can understand -- read and

18    understand the entire document?

19              MR. RIVERA:  Objection, vague.

20         A.   I don't know.

21              MS. LUCAS:  This next document we'll

22    mark as Number 76.  It's an Intake Pre-class

23    Questionnaire.  It's Denver 00071.

24              (Deposition Exhibit 76 was marked.)

25         Q.   (BY MS. LUCAS)  Did you review this

1    **document?**

2          A.   Yes, I did.

3          **Q.   And is it your opinion that Mr. Scott**

4    **can read and understand this entire document?**

5               MR. RIVERA:  Objection, vague.

6          A.   I don't know.

7               MS. LUCAS:  I'm going to mark several

8    different exhibits, and we're going to work with them

9    together.

10         **Q.   (BY MS. LUCAS)  So you can set all those**

11   **documents aside for a moment.**

12              MS. LUCAS:  I'm going to mark Denver

13   000109 as Exhibit 77.

14              (Deposition Exhibit 77 was marked.)

15              MS. LUCAS:  Denver 111 and 112 as

16   Exhibit 78.

17              (Deposition Exhibit 78 was marked.)

18              MS. LUCAS:  113 and 114 as Exhibit 79.

19              (Deposition Exhibit 79 was marked.)

20              MS. LUCAS:  Denver 115 as Exhibit 80.

21              (Deposition Exhibit 80 was marked.)

22              MS. LUCAS:  Denver 117 as 81.

23              (Deposition Exhibit 81 was marked.)

24              MS. LUCAS:  Denver 122 as Exhibit 82.

25              (Deposition Exhibit 82 was marked.)

Page 180

1   be an effective form of communication with Mr. Scott.

2          **Q.   A psychological assessment.**

3          A.   And what's the question related to

4   psychological assessment?

5          **Q.   That speech would not be as effective as**

6   **sign language for Mr. Scott in a psychological**

7   **assessment.**

8                MR. RIVERA:  Objection, vague.

9          A.   Are you talking about an in-depth

10  psychological evaluation or are you asking what is

11  your mood today?

12         **Q.   (BY MS. LUCAS)  Both.**

13         A.   Then those are different things for me.

14         **Q.   Okay.  Then what for each?**

15         A.   I think that you could ask Mr. Scott

16  using speech some simple questions about how he's

17  feeling, what he's feeling like, what he's thinking,

18  and yes, I think that speech probably could be an

19  effective form of communication with him, but not an

20  in-depth psychological evaluation.

21         **Q.   During your evaluation, you used sign**

22  **language to communicate with Mr. Scott?**

23         A.   Most of the time.

24         **Q.   And even during times that you dropped**

25  **some signs and used speech, you did supplement your**

                                                                Page 182

 1            A.   If all I was doing was writing notes

 2     back and forth, but if I was also speaking and

 3     gesturing and things like that, that's a very

 4     different thing.

 5            **Q.   (BY MS. LUCAS)   I'm asking, you could**

 6     **not have gotten that depth of information by only**

 7     **writing notes back and forth?**

 8                 MR. RIVERA:   Objection; vague, compound.

 9            A.   No.

10            **Q.   (BY MS. LUCAS)   You could not have**

11     **gotten that depth of information with oral speech**

12     **communication alone?**

13                 MR. RIVERA:   Objection; vague, compound.

14            A.   I don't know because I didn't try that.

15            **Q.   (BY MS. LUCAS)   When lip-reading or**

16     **speech-reading, how much speech is visible on the**

17     **lips?**

18                 MR. RIVERA:   Objection; vague, compound.

19            A.   That's a really hard question to answer

20     because people rarely just see speech-reading without

21     supplemental cues of everything.   The studies that

22     sort of show that maybe 30 to 50 percent of the

23     information, that's through speech reading alone.   It

24     doesn't include any hearing, any facial expression,

25     any world knowledge of the situation, any background

1          A.    I guess I'll answer using the word

2     "always."  Yes, it would not always be an effective

3     form of communication.  I could see it being effective

4     in some situations.

5          **Q.    (BY MS. LUCAS)  In what circumstances do**

6     **you believe Mr. Scott would require a sign language**

7     **interpreter for effective communication?**

8              MR. RIVERA:  Objection; calls for a

9     legal conclusion, vague.

10         A.    You know, I would have loved to have

11    seen Mr. Scott in more situations to be able to

12    determine that.  I mean the truth is that he can

13    understand some complex conversation through speech.

14    I suspect the more complex the situation got, the more

15    abstract and legal terms got, that probably he would

16    need a sign language interpreter.

17         **Q.    (BY MS. LUCAS)  Okay.  What type of**

18    **complex language?  Can you give me an example?**

19         A.    Oh, the complex embedded clauses that

20    lawyers seem to like to use.

21         **Q.    Give me an example of some complex**

22    **language that Mr. Scott was able to understand.**

23              MR. RIVERA:  Objection, vague.

24         A.    In his own writing, he uses complex when

25    clauses, complex if clauses.  In his own writing and

1    report, you state that you communicate in speech

2    concerning somewhat simpler topics and did not use

3    long, complex questions or complex vocabulary.

4                MR. RIVERA:  Please direct the witness

5    to specifically where you're referring to.

6          Q.    (BY MS. LUCAS)  The first full

7    paragraph.  And that's correct?  You did that,

8    correct?

9          A.    Yes, and I will specifically reinforce

10   "long complex questions."  I did ask him complex

11   questions.

12         Q.    Would you agree that Mr. Scott would

13   need an interpreter to understand more complex

14   questions?

15               MR. RIVERA:  Objection, vague.

16         A.    It depends on what level of complexity

17   is.  Long, complex questions with multiple embedded

18   clauses, yes, but if they were actually -- like a when

19   clause is a complex question.  An if clause is a

20   complex question, and I think he would be able to

21   understand some of those.

22         Q.    Would you agree that Mr. Scott needs an

23   interpreter to understand complex vocabulary?

24               MR. RIVERA:  Objection, vague.

25         A.    How do you define "complex vocabulary"?

Page 217

 1          Q.   (BY MS. LUCAS)  You used it in your
 2    report, so however you used it.
 3          A.   I would say multi-syllabic vocabulary
 4    that's out of ordinary conversation, yes.
 5          Q.   I want to turn to the TACL.  Is that how
 6    you pronounce it, TACL?
 7          A.   Yes.
 8          Q.   And that's the Test of Auditory
 9    Comprehension and Language.  Is that what it's called?
10          A.   Yes.
11          Q.   I'm sorry?
12          A.   Yes, that's what we call it, the TACL.
13          Q.   And what version did you use?
14          A.   I think I used the most recent version,
15    the TACL-4.  I'd have to look at the protocol form.  I
16    gave two subtests of it.  Again, I'd have to --
17          Q.   And did you develop this assessment?
18          A.   No, I did not.  This is a standardized
19    assessment.  I --
20          Q.   And who trained you in this assessment?
21          MR. RIVERA:  Please --
22          Q.   (BY MS. LUCAS)  I'm sorry.  Did you have
23    more to add?  I thought you were done.  Let me ask my
24    last question.  I asked, did you develop this
25    assessment?

 1          A.    Oh, I think the earliest I might have

 2    seen was his intake at the Oklahoma School for the

 3    Deaf.

 4          Q.    And how old was he then?

 5          A.    15.

 6          Q.    So you don't know what his school

 7    reports prior to that time stated?

 8          A.    No, I don't.

 9          Q.    Do you have a response to Paragraph 7?

10          A.    Yes.  I think it's very vague and hard

11    to interpret, and it slices things in a way that makes

12    it complex, that he can use written language for some

13    social communication but can't rely on English --

14    written English during complex situations in the jail.

15    Well, jail has been added on to complex situations.  I

16    don't know.  I could imply from this that he could use

17    written language for social communication and probably

18    some simple -- I don't -- and simple communication in

19    jail.

20               So I think she makes a slice between

21    these two things as if they're actually very

22    different, and I think it's a continuum rather than a

23    completely different situation.

24          Q.    Do you have a response to Paragraph 8?

25          A.    I think it's complex.  Do I think that

Page 250

1   Mr. Scott needs a qualified sign language interpreter

2   most of the time?  Yes, I probably do, but I do think

3   he does understand stuff.  He's been through this

4   situation so many times that I also think he knew he

5   had a right to an interpreter, and if he chose not to

6   request one and signed his name, I also think he's an

7   adult.

8           **Q.   Do you have a response to Paragraph 9**

9   **and sub -- let me start with Paragraph 9.**

10          A.   I think she throws everything in there,

11  that some of these are not very complex situations.

12  What -- to complete a kite -- there are kites in there

13  included that he completed, and they were completely

14  understandable.

15          **Q.   Okay.  So what was completely**

16  **understandable?**

17          A.   He had a kite that asked about when he

18  arrived, could he -- he was told that he could use the

19  videophone.  He had a -- I think it was a kite.

20  Please forgive me if I get the terms of these wrong,

21  but, you know, "I have a rash that I need some help

22  with."  I think that there was some written

23  communication that he did seem to understand, and so

24  to just throw everything into this where he needs it

25  in all of these situations but not limited to seems to

Case 1:12-cv-00053-MSK-BNB   Document 140-2   Filed 07/08/13   USDC Colorado   Page 72 of
Scott v. City & County of Denver   BRENDA S. SCHICK, PH.D. - VOLUME I                    3/12/2013

Page 252

 1    classification?

 2            A.   I have the same response to that.

 3            Q.   **As you do for medical and psychological**

 4    **intake?**

 5            A.   That's right, that these decisions in

 6    some ways are based upon what Mr. Scott believes too,

 7    and if he was giving appropriate responses and seemed

 8    comfortable with the level of communication, he has a

 9    right to be a part of that decision as well.

10            Q.   **What is your response to her opinion**

11    **that he needs an interpreter to translate the inmate**

12    **handbook?**

13            A.   I would agree with that.

14            Q.   **What is your response that he needs an**

15    **interpreter for grievance committee meetings?**

16                 MR. RIVERA:   Objection; vague, lack of

17    foundation.

18            A.   How complex are grievance committee

19    meetings?

20            Q.   **(BY MS. LUCAS)  Well, he had one where**

21    **they were functioned like a court hearing, where he**

22    **was found to be out of location.**

23            A.   Was it as simple as you were out of

24    location, yes or no?

25            Q.   **I don't know.  Mr. Scott didn't have an**

EXHIBIT

34

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 12-cv-00053-MSK-BNB

MAJOR JON MICHAEL SCOTT,

      Plaintiff,

v.

THE CITY AND COUNTY OF DENVER,

      Defendant.

---

**DEFENDANT'S SECOND AMENDED RESPONSES TO PLAINTIFF'S
FIRST REQUESTS FOR ADMISSION**

---

      Defendant, the City and County of Denver ("Defendant"), by its attorney, hereby amends its responses to Plaintiff's First Requests for Admission to Defendant as follows:

<u>**REQUESTS FOR ADMISSION**</u>

Please admit:

      1.    Major Jon Michael Scott is substantially limited in the major life activity of hearing.

      **Response:**    Defendants admit that Major Jon Michael Scott is substantially limited in the major life activity of hearing as of February 11, 2013.

      19.    The City has never documented its reasons for failing to provide a sign language interpreter to Mr. Scott.

      **Response:** Deny.

Respectfully submitted this 11th day of February, 2013.

JOSEPH RIVERA
Assistant City Attorney

By: s/*Joseph Rivera*
Joseph Rivera
Denver City Attorney's Office
201 W. Colfax Ave., Dept. 1108
Denver, CO  80202-5332
Telephone:  (720) 913-3100
FAX: (720) 913-3190
E-mail: dlefiling.litigation@denvergov.org
*Attorney for the City and County of Denver*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of February, 2013, I electronically served the foregoing **DEFENDANT'S SECOND AMENDED RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION** on the following:

Amy Farr Robinson
arob@foxrob.com

Carrie Ann Lucas
clucas@disabledparentrights.org

*s/David L. Washington*
David L. Washington, Paralegal
Denver City Attorney's Office

2

EXHIBIT

35

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | |
| COLORADO CROSS-DISABIITY COALITION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>COLORADO DEPARTMENT OF HEALTH CARE POLICY AND FINANCING, et al.,<br><br>Defendants. | Case No. 09CV11761<br><br><br>COURTROOM 280 |
| **ORDER** | |

This case is before me on Plaintiff Colorado Cross-Disability Coalition's ("CCDC's") request for $116,849.50 in fees and $5,437.52 in costs, for a total request of $122,287.02.  Based on my review of the briefs and attachments, on the evidence and arguments presented at the reasonableness hearing held on July 21, 2011, and on the supplemental written closing arguments filed August 1, 2011, I award CCDC $42,250.00 in fees.

I.      INTRODUCTION

Plaintiff CCDC is a non-profit Colorado corporation.  The other named Plaintiffs are disabled and indigent citizens, or the legal representatives of disabled and indigent citizens, who receive Medicaid benefits, including benefits for home health care, and on whose pro bono behalf CCDC is prosecuting this class action.  Defendants are the Colorado Department of Health Care Policy and Financing and its executive director.

Under a relatively new program called Consumer Directed Attendant Support Services ("CDASS"), the subject home health care Medicaid benefits are now paid directly to the recipients themselves, by-passing what was an interim layer of bureaucracy in the form of provider agencies. Plaintiffs claim that Defendants failed to give them proper notice and an opportunity to be heard when in September and December of 2009 Defendants reduced all Medicaid reimbursement rates, including payments for CDASS benefits, as part of the Governor's across-the-board budget cuts.

The named individual Plaintiffs brought this class action on their behalf and on behalf of all CDASS recipients in Colorado whose CDASS benefits were reduced in September and December 2009 without proper notice and an opportunity to be heard. Plaintiffs' counsel estimates the size of this putative class to be in excess of 1,400. In their Amended Complaint, Plaintiffs assert four claims for relief: 1) a statutory claim for damages under the Medicaid Act; 2) a constitutional claim for damages under the 14th Amendment and 42 U.S.C. § 1983; 3) a declaratory judgment claim; and 4) a claim for an injunction.

On September 15, 2010, before any class certification hearing, the case settled in mediation. Under the written settlement, Defendants agreed not to reduce any CDASS benefits without first sending an agreed-to form of notice to all CDASS recipients. The parties also agreed that CCDC would submit its requested fees to Defendants for their review, and that if the parties could not agree to a reasonable fee to be paid by Defendants to CCDC then the amount of reasonable fees would be submitted to the mediator. The settlement agreement was silent as to what happens if the fee mediation were unsuccessful, which it was. It was also silent as to costs.

Plaintiffs filed a motion to enforce settlement agreement, in which they sought CCDC's requested fees, as well as costs. Defendants objected, taking the position they never agreed to pay CCDC's fees under the settlement. Defendants did not specifically respond to CCDC's request for

costs.  By my Order dated January 17, 2011, I concluded that the written settlement agreement was unambiguous, and that Defendants had in fact agreed to pay CCDC's reasonable fees.  I also concluded that the settlement agreement did not shift costs, and that each side would pay its own costs.  I ordered the parties to file briefs on the amount of fees sought.  In those briefs CCDC sought reconsideration of my denial of costs, and Defendants requested a hearing on the reasonableness of the fees.

In addition to fees through the date of the settlement agreement, September 15, 2010, CCDC seeks post-September 15, 2010 fees, as well as co-called fees-on-fees through the end of the fee hearing, on two alternate theories: 1) these post-September 15 fees and fees-on-fees are all awardable under the written settlement agreement, which did not by its terms cut off fees as of its date; and 2) these fees are in any event awardable under § 13-17-102, because Defendants' post-September 15 positions in resisting the motion to enforce and in resisting the reasonableness of the fees were substantially groundless and frivolous.  CCDC also seeks costs from the beginning of this case through the fee hearing.

Defendants object to the reasonableness of CCDC's fees incurred through September 15, 2010,[1] object entirely to the award of any fees post-September 15, 2010, and object to the award of any costs pre- or post-September 15, 2010.

I conclude that CCDC is entitled to all of its reasonable fees through the filing of its reply brief in support of its motion to enforce settlement, on December 21, 2010, but that it is not entitled to any fees after that point.  I conclude that the reasonable amount of these awarded fees through December 21, 2010, is $42,250.00.  I also reaffirm that CCDC is not entitled to any costs.

II.     GENERAL PRINCIPLES

Of course, we still subscribe to the American Rule, under which each side to litigation pays its own fees, unless fee-shifting is agreed to by contract or authorized by statute. *Crandall v. City and County of Denver*, 238 P.3d 659, 662 (Colo. 2010); *Sifton v. Stewart Title Guar. Co.*, ___ P.3d ___, 2011 WL 2321431, at *3 (Colo. App. 2011). In addition to some organic statutory fee-shifting provisions, § 13-17-102 requires trial courts to award fees against a party whose claims or defenses were substantially groundless, frivolous or vexatious.

The party seeking to recover fees bears the burden of demonstrating its entitlement to the fees it requests. *Regency Realty Inv. v. Clear Fire Prot. Dist.*, ___ P.3d ___ 2009 WL 2782228, at *7 (Colo. App. 2009). Moreover, it has been well-settled since *Ramos v. Lamm*, 539 F. Supp. 730 (D. Colo. 1982), *aff'd in part and rev'd in part*, 713 F.2d 546 (10th Cir. 1983), that where, as here, lawyers are representing clients on a pro bono basis, that fact does not disable the lawyers from seeking to recover a reasonable fee, as long as there is a basis to depart from the American Rule.

To determine whether fees are reasonable, trial courts must begin with the lodestar analysis, that is, an analysis first of the reasonableness of the rates then of the reasonableness of the hours billed. *See, e.g., Spensieri v. Farmers Alliance Mut. Ins. Co.*, 804 P.2d 268, 270 (Colo. App. 1990). The reasonableness of these two components is in turn to be decided in light of all the circumstances of the case, including consideration of the eight factors specifically set forth in Rule 1.5(a) of the Colorado Rules of Professional Conduct. *Tallitsch v. Child Support Services, Inc.*, 926 P.2d 143, 147 (Colo. App. 1996); *Spensieri, supra,* at 271. These eight factors are:

1. The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

2. The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

---

[1] Defendants also continue their objection to an award of *any* fees, preserving this issue for any appeal.

3. The fee customarily charged in the locality for similar legal services.

4. The amount involved and the results obtained.

5. The time limitations imposed by the client or by the circumstances.

6. The nature and length of the professional relationship with the client.

7. The experience, reputation, and ability of the lawyer or lawyers performing the services.

8. Whether the fee is fixed or contingent.

Colo. R.P.C. 1.5(a). Before I apply these factors to the loadstar here, let me address CCDC's renewed request for costs.

III.     COSTS

CCDC's renewed request for costs is DENIED.

Since the substantive case was settled rather than litigated, Rule 54, which is limited to "a decree or order from which an appeal lies," does not apply. C.R.C.P. 54(a). Even if it did apply, I cannot say that CCDC prevailed in this litigation for Rule 54(d) purposes, any more than I could say it prevailed under the fee and cost shifting provisions of § 1983, on which it does not seem to rely. Finally, Rule 54(d) expressly provides that "costs against the state of Colorado, its officers or agencies, shall be imposed only to the extent permitted by law." This phrase has been interpreted to mean that costs may not be awarded against the state unless the General Assembly has enacted a statute specifically allowing an award of costs. *E.g., Farmers Reservoir & Irrig. Co. v. City of Golden*, 113 P.3d 119, 130 (Colo. 2005); *Smith v. Furlong*, 976 P.2d 889, 890 (Colo. App. 1999). No such statute exists that allows these costs.

Plaintiffs' reliance on § 13-16-104 is misplaced. First, that statute simply does not apply here. It is limited to cases in which a plaintiff sues for and recovers damages for a wrong. This case was not only settled, but Plaintiffs recovered no damages under the settlement. As I have

5

already ruled, the parties agreed in the written settlement agreement to shift fees, but not costs. Moreover, even if it applied, our court of appeals has expressly found that § 13-16-104 is *not* a specific grant of authority to allow the awarding of costs against the state. *Smith v. Furlong, supra,* 976 P.2d at 890-91.

IV.   THE FEE-SHIFTING PROVISION IN THE SETTLEMENT AGREEMENT ENTITLES PLAINTIFFS TO ALL THEIR REASONABLE FEES INCURRED IN ENFORCING THE SETTLEMENT, BUT NOT TO THE FEES-ON-FEES INCURRED AT THE REASONBALENESS HEARING

I agree with Plaintiffs that the fee-shifting provision in the written settlement agreement entitles Plaintiffs to recover all the reasonable fees they incurred not just in litigating and settling this case but also then in moving to enforce the settlement agreement.  Any other conclusion would reduce the value of the fee-shifting provision below what I believe were the parties' contracted-for expectations.  It is a hollow promise indeed if I promise to pay your fees, and then force you to incur additional fees by claiming I never made that promise.

My conclusions in this regard are bolstered by the extrinsic evidence.  Plaintiffs' counsel is in-house to CCDC, a not-for-profit entity.  The only way they can keep their doors open is through charitable contributions and fee awards.  It is inconceivable to me that Plaintiffs' counsel would have entered into an agreement for fees, knowing that the value of that agreement could be compromised through the simple artifice of Defendants denying that they had agreed to pay fees.

Alternatively, I find and conclude that Defendants' position on the motion to enforce was substantially groundless and frivolous.  It is utterly ridiculous to argue, as Defendants did here, that they agreed to a two-step process to liquidate CCDC's fees—first by trying to reach an agreement on their own and then, failing that, by submitting the reasonableness issue to the mediator—with the understanding that in the end if no agreement on reasonableness could be reached then

6

Defendants would pay *no* fees.  The only reason Defendants agreed to the processes to try to liquidate CCDC's fees is because Defendants agreed to pay those fees.

Indeed, when at the fee hearing I asked Defendants' counsel how she could square this two-step liquidation provision with Defendants' position that they never agreed to pay fees, the only thing she could come up with was that this provision was from earlier drafts, and was left in the final settlement agreement by mistake.  That explanation itself is groundless and frivolous.  This was an extraordinarily short written settlement agreement, consisting of just a little over two typed pages.  The idea that the assistant attorney general and her public clients all signed this short agreement without reading it is simply not credible, and course even if it were true, such a unilateral and wholly unreasonable mistake would not be a defense.

But it is a much closer question for the so-called fees-on-fees, that is, the fees CCDC incurred in preparing for and conducting the reasonableness hearing.  For one thing, it seems to me to be quite a stretch to say that by agreeing to shift fees, Defendants necessarily agreed to pay CCDC's fees incurred in objecting to the *amount* of the requested fees.  Indeed, here, with no market forces cabining Plaintiffs' counsel's fees, it seems unlikely that the attorney general would ever have agreed to constrain her clients' own right to object to the reasonableness of the requested fees by agreeing in advance to pay for fees-on-fees.  Moreover, the state of the law on fees-on-fees is somewhat uncertain.  There are several cases that purport to state the rule that fees-on-fees are not recoverable unless the defense interposed to the fees was itself substantially groundless, frivolous or vexatious within the meaning of § 13-17-102.  *See, e.g., Foxley v. Foxley*, 939 P.2d 455, 460 (Colo. App. 1996).  Here, not only was Defendants' resistance to the reasonableness of the requested fees not groundless or frivolous, it was in part successful, as discussed below.

V.     THE REASONABLENESS OF THE FEES

Through the date of their reply brief in support of their motion to enforce the settlement agreement, which was filed on December 21, 2010, Plaintiffs seek $55,996 in fees.[2]

Before I look at each of the loadstar components to these fees, let me apply each of the eight Rule 1.5(a) factors to this case.

**1.  The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.  D**isability law tends to be complex, both substantively and procedurally, and this case was more complex than average.  It took counsel into several different uncharted territories, including two particularly unique areas: 1) whether the usual forms of notice required by federal law also apply to this new kind of program, CDASS, where the benefits are paid directly to the recipients rather than through a service provider; and 2) the interplay between the federally-required notice and the Governor-mandated budget cuts.  Defendants' contention that they were willing all along to enter into this settlement is belied by the undisputed facts.  It took this lawsuit, the mediation that arose from it, and apparently enough drafts of the settlement agreement to confuse defense counsel and her clients, to settle this case.

**2.  The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.**  There was no evidence at this hearing directly on this factor, at least as to what Plaintiffs themselves may have known.  But we do know that CCDC's legal "department" consists entirely of Messrs. Williams and Montoya as lawyers and Ms. McCarten as paralegal.  Any significant litigation like this case will divert any

---

[2] I derive this figure from the bills attached to the motion for fees.  Those bills, attached as Exhibit 2 to the motion, show total fees through February 7, 2011, of $94,861.  Of that total, $38,865 was for work done after December 21, 2010, the date Plaintiffs filed their reply in support of their motion to enforce settlement.  The difference between these two amounts is $55,996, which therefore represents the fees billed for work from the beginning of this case through December 21, 2010.

small firm's attention away from other employment.  And, indeed, Mr. Williams represented in his

brief that the suddenness of these cuts forced CCDC to "drop everything" to address them.  Brief,

filed February 7, 2011, p. 27.  On the other hand, any such "other employment" would also be pro

bono work, so I give very little weight to this factor in assessing the reasonableness of these fees.

**3.  The fee customarily charged in the locality for similar legal services.**  There was no

particular evidence on this factor, other than what is discussed below regarding the reasonableness

of Plaintiffs' counsel's hourly rates.

**4.   The amount involved and the results obtained.**  Although Plaintiffs had damage

claims, the real focus of this litigation was to stop the proposed cuts until proper notice and an

opportunity to be heard.  Plaintiffs accomplished that goal.

**5.  The time limitations imposed by the client or by the circumstances.**   There was

some general urgency created by these proposed cuts.  Had they gone forward, some recipients of

these direct benefits may have already overspent their monthly allocations.

**6.  The nature and length of the professional relationship with the client.**  There was no

evidence that any individual Plaintiff had any particularly long or deep relationship with Plaintiffs'

counsel.  On the other hand, this is what CCDC and its lawyers do: they represent classes of

disabled and indigent people, many of whom undoubtedly overlap case to case.

**7.  The experience, reputation, and ability of the lawyer or lawyers performing the**

**services.**  I address this factor below, in discussing the reasonableness of Messrs. Williams' and

Montoya's hourly rates.

**8.  Whether the fee is fixed or contingent.**  Here, the fee was neither fixed nor contingent;

it was pro bono.  But this factor is meant to reflect the degree of risk a lawyer takes on by the

nature of his fee.  A contingent fee is riskier than a fixed fee, and therefore weighs in favor of a

higher overall fee.  No fee at all—or more precisely, CCDC's hope that it would either prevail on the § 1983 claim, with its attendant fee-shifting provision, or, short of that, get some fees as part of a settlement—makes this kind of arrangement at least as risky for CCDC as a contingent fee arrangement, and in my view therefore weighs in favor of a higher fee.

With these eight factors in mind, let me now turn to the two loadstar components.

A.      The Reasonableness of the Rates

Plaintiffs seek fees for the work of three different time-keepers: attorney Kevin Williams, who billed $330 per hour in 2010 and $345 per hour in 2011; 2) Andrew Montoya, who was first a law student who billed at the paralegal rate of $100 per hour, then, after he passed the bar, billed at the associate's rate of $200 per hour; and paralegal Briana McCarten, who billed $90 per hour in 2010 and $100 per hour in 2011.  I share Defendants' general skepticism about the reasonableness of these rates, given the fact that they are not the market product of any arms-length agreement by any clients to actually pay those rates.  But I am nevertheless persuaded, despite this skepticism, that Mr. Williams' rates and the paralegal rates were all reasonable.  I find that $200 for a first-year associate is unreasonable in these circumstances, and that a reasonable rate for Mr. Montoya would have been $160 per hour.

Let me start with the two easiest rates.  Paralegal hourly rates of $90 in 2010 and $100 in 2011 are eminently reasonable, and indeed probably a little low based on my experience presiding over these kinds of fee issues.  By contrast, the $200 per hour for Mr. Montoya once he passed the bar is palpably unreasonable.  The Colorado Bar Association 2008 Economic Survey shows that the average hourly rate charged by associates in one-partner firms was $227, but of course this included associates who had been out of law school many years.  A first-year associate generally knows much less about how law really works than an experienced paralegal, though I recognize

10

that here Mr. Montoya worked in both capacities.  In any event, doubling his hourly rate because he passed the bar is simply unreasonable.  I conclude that a reasonable hourly rate for Mr. Montoya's work as a first-year associate would have been no more than $160.

As for Mr. Williams' hourly rates of $330 in 201 and $345 in 2011, I am satisfied that these are reasonable.  Mr. Williams is an experienced lawyer who specializes in disability law.  As already mentioned, this is a highly specialized area of the law, both substantively and procedurally, often involving, as it did here, class action allegations.  Mr. Williams graduated third in his class from the University of Denver School of Law in 1996, and has represented disabled plaintiffs in more than 100 cases, including *Lucas v. Kmart Corp.*, Case No. 99-JLK-001923 (D. Colo.), a class action in federal court, and *Rossart v. Developmental Pathways, Inc.*, Case No., 06CV4479 (Denver Dist. Ct.), a class action in state court and a case over which I happened to preside.  Mr. Williams' work in the subject case was performed at the same high level I have consistently seen from him in the past.

I was persuaded by Plaintiffs' expert, Mr. Timothy Fox, who does this very same kind of litigation, and who testified these rates were reasonable.  Indeed, Mr. Fox testified that he charges real, paying, clients as much as $360 per hour.  True, Mr. Fox has been practicing since 1991—a little longer than Mr. Williams—but, as I understand it, Mr. Fox has been focused on disability law only since 1996.

I was not at all persuaded by Defendants' expert, Mr. David Brougham.  Though Mr. Brougham is more experienced than Messrs. Williams and Fox put together, he has never represented a plaintiff in any kind of case, let alone a disability class action.  The entirety of his experience is on the defense side, and most of that was defending municipalities who are either insured or self-insured members of groups who pool their risks.  For as long as I practiced, and for

11

as long as I have presided over attorneys fee issues, insurance defense lawyers have always commanded hourly rates substantially lower than prevailing rates.  Indeed, the 2008 Economic Survey shows that the average civil litigator billed at $260 per hour, while the average insurance defense lawyer billed at $166 per hour.  See also 2011 SURVEY OF BILLING AND PRACTICES FOR SMALL AND MIDSIZE LAW FIRMS, HTTP://ACCOUNTING.SMARTPROS.COM/X71411.XML (national survey showing commercial litigators at medium and small firms billed at $398 per hour and insurance defense lawyers at $199 per hour).  The fact that in all of Mr. Brougham's 39 years as an insurance defense lawyer he has never billed more than $175 per hour may speak volumes about the competitiveness of the insurance industry and the lawyers who in turn compete for insurers' legal business, but it tells me virtually nothing about the reasonableness of Plaintiffs' counsel's rates.

Nor was I persuaded by Mr. Brougham's reliance on a recent case in which former Justice Jean Dubofsky billed $300 per hour for a civil rights case.  All of us can cherry-pick rates of highly respected lawyers who bill less than Plaintiffs' counsel, and less highly respected lawyers who bill more than Plaintiffs' counsel.  One or two lawyers, no matter their professional standing, does not a reasonable rate make.  In fact, if I were to cherry-pick cases and lawyers I might be much more inclined to look at what these very Defendants have in the past agreed to pay this very same Plaintiffs' counsel in a case very similar to this one.  In *Rossart, supra*, the fees Defendants agreed to pay Mr. Williams were based on an hourly rate of $360, which I found reasonable.  Admittedly, Defendants in that case agreed to pay only $245,000 out of the $360,000 loadstar.  Even so, the effective compromised rate—$245 per hour—is substantially more than the defense expert, Mr. Brougham, has ever billed.

In the end, the reasonableness of a fee is a broad and normative inquiry, and I am persuaded that $330 in 2010 and $345 in 2011 are not unreasonable rates for this kind of work, done by a lawyer of Mr. Williams' caliber, and taking into consideration all of the Rule 1.5(a) factors discussed above.

B.      The Reasonableness of the Hours

My conclusion on fees therefore comes down, as it so often does, to an assessment of the reasonableness of Plaintiffs' hours.  Taking into consideration all the Rule 1.5(a) factors discussed above, and for the more particular reasons set forth below, I conclude that a reduction in the hours billed, and therefore in the total fees awarded, is appropriate.

1. **Billing Overhead as Paralegal Time.**  I agree with Defendants that both Mr. Montoya and Ms. McCarten occasionally billed for professional services when their activities are more properly characterized as overhead.   For example, Ms. McCarten billed for time spent in "transcribing" a pleading, and Plaintiffs did not meet their burden of demonstrating that this was instead drafting work.  There was other work that appeared to be secretarial work that was billed as if it were paralegal work.

2. **Redundant or Unnecessary Work.**  There were some items billed for work that I conclude was redundant, unnecessary, took too long or otherwise should not be recovered.  For example, Mr. Williams has an entry in which he purported to bill 20 hours for general research into Medicaid.  This was a complicated case, but Mr. Williams is a Medicaid expert, and surely he did not need to spend 20 hours refreshing himself about Medicaid notice requirements.  Likewise, he spent a comparable amount of time researching "class certification issues."  Mr. Montoya spent a large amount of time doing what the defense expert called "getting himself up to speed."  Of course, part of the reason for discounting Mr. Montoya's reasonable hourly rate from $200 to $160

13

is to reflect the fact that all first-year lawyers have to spend lots of time getting up to speed. But some of this seemed excessive even for a first-year lawyer, largely repeated what Mr. Williams was already doing, and did not advance the case. Plaintiffs' counsel also spent a considerable amount of time getting ready for a class certification hearing that was never held; indeed, the case settled two full months before the scheduled certification hearing.

    **3. Block Billing.** There are some examples of bills that include so many disparate items under a single reported time that I agree with Defendants' characterization of them as "block bills." This was not a common problem, and in general Plaintiffs' counsel's bills were as good or better in this regard than most I've seen over the years. But some small reduction is warranted for those block entries that make it impossible for me to determine whether the time spent was reasonable.

    **4. Erroneous Entries.** A very few entries were mistakes, including time reported to amend a complaint after the amended complaint was already filed, and one entry for researching CCDC's non-profit status with the I.R.S.

    C.      Adjusting the Loadstar

Taking all of the circumstances of this case into consideration, including the eight factors of Rule 1.5(a) and the particular circumstances discussed above, and remembering also that I am reducing Mr. Montoya's rate from $200 per hour to $160 per hour, I conclude that of the $55,996 loadstar still in play (representing the fees Plaintiffs incurred from the beginning of this case through December 21, 2010), $42,250 is reasonable.

VI.    CONCLUSION

JUDGMENT FOR FEES HEREBY ENTERS in favor of Plaintiff Colorado Cross-Disability Coalition, and against Defendant Colorado Department of Health Care Policy and Financing, in the amount of $42,250.00, plus post-judgment interest at the statutory rate.

DONE THIS 10TH DAY OF AUGUST, 2011.

BY THE COURT:

_____
Morris B. Hoffman
District Court Judge

cc:  All counsel