**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 12-cv-00053-MSK-BNB

**MAJOR JON MICHAEL SCOTT,**

      Plaintiff,

v.

**THE CITY AND COUNTY OF DENVER,**

      Defendant.

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR ATTORNEY FEES**

---

**THIS MATTER** comes before the Court pursuant to Mr. Scott's Motion for Attorney Fees **(# 140)**, Denver's response **(# 147)**, and Mr. Scott's reply **(# 150)**.

Mr. Scott (who is deaf) commenced this action in January 2012, asserting claims that Denver violated the Rehabilitation Act and Americans With Disabilities Act when if failed to provide him with a sign language interpreter at times when he was incarcerated at the Denver County Jail. The action proceeded through a somewhat contested discovery phase, with both sides filing numerous discovery motions, but neither party filed any dispositive motions.

At the conclusion of discovery in or about May 2013, Mr. Scott accepted Denver's Offer of Judgment under Fed. R. Civ. P. 68, agreeing to accept the entry of judgment against Denver in the amount of $15,000, plus reasonable attorney fees, but with no award of equitable relief. Mr. Scott now moves **(# 140)** for an award of $ 427,372.50 in attorney fees and $ 21,996.49 in untaxed costs.

1

Because Denver stipulated to the entry of judgment including an award of reasonable attorney fees, the sole question for this Court is what fee award is reasonable. Normally, the Court calculates this sum using the familiar "lodestar" analysis, multiplying a reasonable hourly rate by the reasonable number of hours expended, and adjusting that figure upward or downward to account for any extraordinary circumstances. S*ee generally Gisbrecht v. Barnhart*, 535 U.S. 789, 801-02 (2002) ("the 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence").[1]

However, before beginning the lodestar analysis, the Court pauses to briefly address the apparent incongruity between a claim settled pre-trial for $15,000 and attorney fee charges of $427,000. From a purely legal perspective, there is no requirement that the amount of fees awarded to a prevailing party be proportional to the amount of the recovery. *See e.g. City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986). As the court explained in *Anderson v. AB Painting and Sandblasting, Inc.,* 578 F.3d 542, 545 (7th Cir. 2009), "[b]ecause Congress wants even small violations of certain laws to be checked through private litigation and because litigation is expensive, it is no surprise that the cost to pursue a contested claim will often exceed the amount in controversy." At the same time, such cases also recognize that "the amount of

---

[1] Denver makes an abbreviated argument that the Court should deny fees to Mr. Scott outright, on the grounds that he achieved only a "technical" or "nominal" victory. *See Farrar v. Hobby,* 506 U.S. 103, 114 (1992). To ascertain whether fees should be denied to a plaintiff under a "technical victory" theory, the Court considers three factors: (i) the degree of success – that is "the difference between the judgment recovered and the recovery sought"; (ii) the significance of the legal issue on which the plaintiff claims to have prevailed; and (iii) whether the plaintiff's claim accomplished some public goal. *Zinna v. Congrove*, 680 F.3d 1236, 1240-41 (10th Cir. 2012); *Lippoldt v. Cole* 468 F.3d 1204, 1222 (10th Cir. 2006). Although the first (and most important) factor tips against Mr. Scott here – his $15,000 settlement reflecting a small fraction of the damages he once sought – the remaining two factors tip slightly in Mr. Scott's favor. Ultimately, although the question is a fairly close one, the Court cannot say that Mr. Scott's settlement reflects only a "technical" victory like that of *Farrar*.

damages a plaintiff recovers is certainly relevant to the amount of attorney's fees to be awarded." *Riverside*, 477 U.S. at 574. *Anderson* suggests that "the district court's fee order should evidence increased reflection before awarding attorney fees that are large multiples of the damages recovered or multiples of the damages claimed," as "attorney fees that are several times the amount of the actual damages . . . raises a red flag." 578 F.3d at 545-46. In Anderson, the claim was for approximately $ 50,000 in fees to obtain a $6,500 award. If that differential raises a "red flag", then the fee request in this case of $427,000 to recover $15,000 raises a "stadium-sized banner". With this in mind, the Court's review is particularly careful.

Turning to the lodestar calculation, the Court begins with the hourly rates charged by Mr. Scott's counsel. Mr. Scott was primarily represented by two attorneys, Ms. Robertson, who had more than 20 years of experience, charging an hourly rate of $ 440, and Ms. Lucas, an attorney with approximately 8 years of experience, charging an hourly rate of $290. Denver contends that these rates are excessive, and that a reasonable rate in the Denver legal market would be $ 375 for Ms. Robertson and $ 200 for Ms. Lucas. Both parties have submitted affidavits in support of their contentions.

In a recent decision in a commercial dispute, this Court recognized that "the prevailing rates in Denver for experienced litigators approach $400 per hour in recent years," with $ 450 per hour representing the maximum hourly rate that could be considered reasonable for lead trial counsel. *Xtreme Coil Drilling Corp. v. Encana Oil & Gas Corp.*, ___ F.Supp.2d ___, 2013 WL 3810861 (D.Colo. Jul. 23, 2013). The Court also refers to the results of a 2010 survey of attorneys by the Colorado Bar Association, found at www.cobar.org/index.cfm/ID/22049.[2]

---

[2] That survey is expressly referenced in the affidavit of Darold Kilmer, submitted by Mr. Scott in support of his request for fees.

Although that survey does not address partner billing rates, it concludes that billing rates for associates[3] with Ms. Lucas' experience in the Denver metro area ranged from $150 per hour to $260 per hour, with a median of $210.  Adjusting the 2010 figures for inflation (if any) suggests that the rates charged by Ms. Robertson and Ms. Lucas sit at the very outer edge of what might be considered "reasonable" in the Denver market.

The Court then turns to the question of the number of hours expended by Mr. Scott's counsel.  Both parties have devoted dozens of pages of argument and affidavits to attacking and defending individual time entries.  These submissions are instructive, but not for the reasons intended by the attorneys who submitted them. The particularity and amount of argument devoted to each pinpoint of disagreement reflects how contentious this litigation was and how counsel on both sides were unable to evaluate and prioritize the significance of the parties' disputes.

Rather than following counsels' lead from tree to tree, the Court begins with the forest.  Although the undersigned was never called upon to adjudicate any of the disputes between the parties in this matter, it takes at face value Mr. Scott's contention that the primary dispute between the parties was the extent to which Mr. Scott had functional communicative abilities without the assistance of a sign language interpreter -- or, in Mr. Scott's words, whether he "was able to hear better than he let on."  The record reflects that discovery in this matter was also contentious.  Both parties filed motions seeking to compel the other side to produce withheld documentary evidence, and both sides' motions to this effect were granted in part and denied in part by the Magistrate Judge.  Mr. Scott designated one expert witness and Denver two, each of

---

[3]    Although Ms. Lucas is not employed by Ms. Robertson, her years of experience relative to Ms. Robertson's warrant viewing Mr. Scott's representation as akin to the partner-associate model, with Ms. Lucas performing the types of tasks that might be delegated to a senior litigation associate at a law firm.

whom examined Mr. Scott and were later deposed about their conclusions. In addition, it appears the parties took 14 additional depositions of lay witnesses, although the record does not provide meaningful information of who was deposed and on what subjects. The record indicates various additional discovery disputes regarding a variety of matters. All tolled, Mr. Scott's counsel devoted 1,057 hours to this matter, with paralegal support of an additional 330 hours.

The Court finds the hours claimed by Mr. Scott's counsel are to be excessive in several respects. Mr. Scott's counsel spent an excessive amount of time hours for in preparation for depositions, included time spent on duplicate services that could and should have been performed by a single attorney, included attorney time for matters that could and should have been delegated to paralegal staff, and included hours devoted to research and exploration of issues not clearly related to Mr. Scott's claims.[4] For example, Ms. Robertson billed over 29 hours in October 2012 for preparation for the deposition of a single witness, Lorrie Kosinski, Director of Denver's Office of Sign Language Services. (In addition and by way of contrast, Ms. Lucas' own time entries list approximately 1-2 hours of her own time reviewing "outline[s]" or doing other preparatory-type tasks for this deposition.) The deposition of Ms. Kosinski itself took only 7 hours.[5] Such extensive time is particularly puzzling given that Ms. Robertson had

---

[4] The significance of seemingly excessive, redundant, and unnecessary attorney time is magnified in a case such as this, where Ms. Robertson and Ms. Lucas claim the maximum possible hourly rate. Such rates suggest the consummate skill of each counsel, and thus, the Court expects Ms. Robertson and Ms. Lucas to perform each task at the maximum possible level of efficiency.

[5] Litigators are often taught certain rules of thumb for budgeting a case for fiscal (*i.e.* advising the client of the potential cost of the litigation) or time management (*i.e.* to assist the attorney in allocating the appropriate time to a case) purposes. Depending on who is doing the teaching, the rule of thumb for deposition preparation might suggest the allocation of as little as one hour of preparation time per hour of deposition time, and as much as three hours of preparation for each hour of deposition. *See e.g. Caruso v. Zenon*, 2006 WL 5106110 (D.Colo. May 11, 2006) (slip op.). Even adopting the most generous 3:1 ratio, Ms. Robertson's

5

already deposed Ms. Kosinski in a "companion case" to this action, in which Ms. Robertson and Ms. Lucas represented other deaf Denver County Jail inmates bringing the claims against Denver for failing to provide sign language interpreters.

Another example is found in Ms. Lucas' charge of approximately 85 hours in February and March 2013 in preparation for the deposition of Brenda Schick, one of Denver's designated experts. Ms. Schick was deposed for only 6 hours.[6] Among the many hours claimed by Ms. Lucas for such preparation are nearly 5 hours reading publications by Ms. Schick "on quality of life and manually coded English and ASL linguistics," and 4 hours reading a publication by Ms. Schick on "theory of mind and acquisition of language." The record before this Court offers no particular explanation as to why it was necessary for Ms. Lucas to review these publications in such detail (or indeed, given the seemingly abstract subject matter, at all).

As to the unnecessary duplication of services, the Court notes that both Ms. Robertson and Ms. Lucas both billed for time for in their discussions, and discussions with paralegals (for which the paralegal also billed). The record is replete with charges by Ms. Lucas billing time for conferences, telephone calls, or correspondence with Ms. Robertson. Taking the month of

---

preparation time for Ms. Kosinski's deposition – at a rate of something more than 4:1 -- is excessive.

[6] Apparently included in this 6 hours were numerous questions by Ms. Lucas to Ms. Schick about Ms. Schick having been arrested for DUI and marijuana possession. Denver's counsel objected to these questions and ultimately had to file a motion for a protective order preventing Ms. Lucas from inquiring into these irrelevant and prejudicial matters. The Magistrate Judge granted Denver's motion.

Mr. Scott argues that his counsel have excluded "all time associated" with their pursuit of these irrelevant issues. It is not clear if this is entirely accurate. Among the billing entries that Mr. Scott seeks compensation for is a March 4, 2013 entry for 5.2 hours by Ms. Lucas, reading "research Schick background on internet search engines (2.5)." It is not clear from the context whether this search involved Ms. Schick's <u>professional</u> background or her <u>personal</u> one. Even assuming that such research was into Ms. Schick's professional reputation, it would appear that this time is excessive and duplicative, given the extensive preparation time taken by Ms. Lucas for Ms. Schick's deposition.

January 2013 as an exemplar, Ms. Lucas has 13 separate billing entries for communication with or reviewing of communications involving Ms. Robertson. In situations where an experienced counsel such as Ms. Robertson avails herself of the assistance of a less-experienced attorney to perform certain tasks, it is redundant for both counsel to bill for conferences in which the senior attorney is instructing the junior attorney, or where the junior attorney is reporting back to the senior attorney on the progress of a project (especially when both counsel are claiming the maximum possible rate for their time). Certainly, it may be appropriate for both counsel to bill time for occasional strategy planning sessions, where both are bringing value to the discussion, but mere transmission of information between the attorneys or attorneys and paralegal does not translate double value to the client or case. *See Clawson v. Mountain Coal Co.*, 2007 WL 4225578 (D.Colo. Nov. 28, 2007) (slip op.) ("Meetings that are conducted simply to assign a task, or to ensure that a task is progressing as requested, do little to advance the substance of the litigation and should not give rise to a fee award"). Nevertheless, the record here suggests that Mr. Scott's fee claim includes both sides of these routine discussions between attorneys, or between an attorney and a paralegal.

The record also reflects that both counsel attended the same depositions, even though only one had prepared for and took the depositions. Jane Andrews, Mr. Scott's designated expert, was deposed on March 29, 2013. Ms. Robertson, who took that deposition, billed 7.8 hours for that day. Ms. Lucas billed 9.3 hours for traveling to and attending that deposition, but there is no apparent justification for Ms. Lucas to have attended that deposition at all.[7] Mr. Scott

---

[7] Another example is Ms. Schick's deposition on March 12, 2013: Ms. Lucas took the deposition, billing 6.0 hours for the deposition itself. Ms. Robertson billed 3.0 hours for "participat[ing] in the deposition," and an additional 1.7 hours for travel to and from that deposition, even though there is no indication as to the nature or necessity of Ms. Robertson's "participation."

argues that Denver itself brought two attorneys to the depositions, but this proves nothing: the fact that Denver may have also acted unreasonably in staffing the case does not suffice to cure unreasonable time expenditures by Mr. Scott's own counsel.

As to the unnecessary expenditure of attorney time on clerical and other tasks, Denver accurately points out several occasions in which Ms. Lucas billed for tasks that seemingly should have been performed by clerical staff. For example, on February 25, 2013, Ms. Lucas billed 5.7 hours for an entry reading "review and respond to multiple emails re video (.8), research file extension and system used to record video, telephone call to company who owns the CCTV system (1.8), telephone call with Amy Robertson re same (.3), attempt to open file with various programs and download file readers (2.8)." The Court assumes this entry concerns Ms. Lucas' attempts to view or copy a video pertinent to the case, but it is unclear why this task was not delegated to a competent non-attorney staff member. Certainly, these tasks did not call upon Ms. Lucas' legal knowledge or expertise. Similarly, in October 2012, Ms. Lucas billed several hours relating to preparation of a "video outreach letter to potential witnesses," including recording the video, posting it to You Tube, and burning 90 DVDs. It is entirely unclear why attorney time would be required for such a task.

Finally, the Court notes numerous instances of time spent by Mr. Scott's counsel on tasks whose significance to the action – and especially to the issues upon which Mr. Scott was ultimately successful – are unclear. Given that Mr. Scott failed to secure any injunctive relief that would run to others, it is unclear how the use of a "video outreach letter to potential witnesses" – presumably other deaf people who were once inmates in Denver – would be

---

Similarly, both counsel attended Ms. Kosinski's October 31, 2012 deposition, with Ms. Robertson billing 7 hours for actually taking the deposition, and Ms. Lucas billing 7.3 hours for traveling to and simply observing the deposition.

8

relevant to the facts of Mr. Scott's own ability to hear and communicate or to his claim for individual damages. Mr. Scott also seeks fees for some 19 hours his counsel spent conferring with the U.S. Department of Justice on an investigation relating to Mr. Scott's claims. Although the Court recognizes that intervention by federal authorities on his behalf may have conferred a strategic benefit on Mr. Scott in his negotiations with Denver, the Court cannot deem those hours to be reasonably expended in prosecution of Mr. Scott's claims that may be charged as fees to Denver. Tactical decisions made by a party to bring outside pressure to bear on one's opponent – be it a complaint to regulatory authorities or merely organizing a public protest or boycott -- might make for good litigation strategy, but it is not compensable time.

Finally, the Court turns to a handful of other matters. It notes Denver's objection to (primarily) Ms. Lucas billing her full hourly rate for travel time. The record reflects that both of Mr. Scott's counsel billed numerous hours for travel time to and from meetings with Mr. Scott,[8] and to and from depositions and court hearings. The record indicates that nearly all of this travel was by car, suggesting that counsel was otherwise unproductive during this travel time. In *Achondo v. Anderson, Crenshaw & Assocs., LLC*, 616 F.3d 1098, 1105-06 (10th Cir. 2010), the 10th Circuit explained that although attorney travel time may be compensable in a fee award, "a trial court has discretion to apply a reduced hourly rate if the time is otherwise unproductive." Here, given the extremely high rates charged by Mr. Scott's counsel and the extensive number of

---

[8] The Court notes that Mr. Scott was housed in a state prison facility in Canon City, Colorado during some portions of this litigation. The Court has some doubt that the number of visits made by Mr. Scott's counsel to that facility – Ms. Lucas' affidavit alone recites 6 separate trips to Canon City to assist Mr. Scott, as well as 4 trips to visit Mr. Scott when he was housed in a facility in Denver -- were all reasonable and necessary, and that the purposes of those visits could not have been accomplished more reasonably with written correspondence, videoconferences, or other alternatives to lengthy and time-consuming car travel (especially from Ms. Lucas' offices in Windsor, Colorado). Although attorneys may desire to have frequent contact with a client during litigation, that desire must be somewhat subordinated to economic and practical realities when the client becomes incarcerated.

hours spent on travel, the Court believes it appropriate to reduce the rates claimed by Mr. Scott's counsel for such travel.

The Court further notes that, although discovery was fairly contentious in this case, it is not clear that it can be said that either party prevailed in most of the discovery disputes. It is sufficient to note that both sides saw roughly equivalent successes and failures on their discovery motions, suggesting that both sides share some responsibility for the contentiousness of the discovery. Mr. Scott cites to authority for the proposition that a party may not object to the excessiveness of its opponent's demand for attorney fees if that party's own vigorous litigation tactics caused the excessive fees. *Citing Robinson v. City of Edmond*, 160 F.3d 1275, 1284 (10th Cir. 1998) ("part of an attorney's calculus of the amount of time reasonably necessary for a case is the vigor which the opponents bring to the dispute"). But that observation cuts both ways: just as Mr. Scott may be entitled to claim additional hours due to excessive vigor on Denver's part, he should not be able to claim additional hours where his own zealousness unreasonably broadened or intensified the litigation. At bottom, it is clear to the Court that both parties appear to have devoted far more time and expense into this matter than most attorneys would consider reasonable for a simple case with the potential for relatively minimal damages.[9]

Ultimately, the Court finds merit in many of the objections that Denver has lodged to the fees claimed by Mr. Scott. In addition to the various matters discussed above, the Court finds that an adjustment should be made for the fairly limited degree of success Mr. Scott had in the remedial phase of this action. Mr. Scott initially sought both compensatory damages and

---

[9] As is often the case where the same counsel are simultaneously involved in multiple cases addressing similar issues, there is often the tendency for parties to overpursue one case in the hopes that it will create leverage with the party's position in the companion case. The Court suspects that the companion litigation is a significant factor in the apparent overzealousness with which both sides litigated Mr. Scott's case.

equitable relief (for himself and others). As late as January 2013, he was demanding $ 60,000 in damages, the ability to participate in the drafting of new city policies, and $240,000 in attorney fees.[10] Acceptance of Denver's Offer of Judgment four months later gave him $15,000 and no equitable relief. Although Mr. Scott technically "prevailed" in the sense that Denver agreed to settle the case for a fairly small sum, the Court is compelled to observe that Mr. Scott ultimately obtained fairly little in return for his enormous expenditure of attorney fees.

Although it is difficult to quantify the appropriate reduction in fees that takes into account both overbilling and the limited results, a holistic review of the billing records and the record suggest that a reduction in the fee requested by Mr. Scott's counsel by 66% is appropriate. Such reduction addresses both quantitative and qualitative concerns. As discussed earlier, Mr. Scott's billing records reflect numerous instances of billing for excessive time and duplicative services. Using only the deposition preparation hours as an example, Ms. Robertson's hours are approximately double what might be considered reasonable for the tasks discussed, and Ms. Lucas' hours are several times higher than what would be appropriate. The frequency with which both Ms. Robertson and Ms. Lucas billed for what appear to be routine office discussions warrants a further reduction of several percent, as do those billing entries which appear to have no material relevance to the case. The Court is particularly influenced by Mr. Scott's failure to ultimately secure any broad injunctive relief: a case in which a plaintiff attempts to secure equitable relief for others, as well as himself, is far more demanding on counsel than a simple case in which the plaintiff seeks only token monetary relief. Had counsel's time been limited to

---

[10]  This figure itself is unreasonably high for that point in the litigation, and the Court has little doubt that Mr. Scott's counsel's demand for such large fees contributed to the failure of this case to settle earlier. Mr. Scott concedes that Denver ultimately offered to settle the action for $75,000 (inclusive of fees), well over Mr. Scott's demand for compensatory damages, suggesting that Mr. Scott's attorney fees largely drove the litigation from that point onward.

11

tasks that necessarily and reasonably led to him securing $15,000 payout, the Court is convinced that the relevant fee request would be far lower.

A reduction of 66% results in a fee of slightly more than $141,000 which is consonant with the a fee award made in *Grievson v. Rochester Psychiatric Center*, 746 F.Supp.2d 454 (W.D.N.Y. 2010), a case Mr. Scott cites for its similarity to this one. In *Grievson*, the deaf plaintiff contended that she was denied sign language interpretation services during a 21-day stay in a psychiatric institution. Like Mr. Scott, she brought claims under the Rehabilitation Act and ADA, and like Mr. Scott, she settled the case shortly after the close of discovery for $ 14,000 and an award of a reasonable attorney fee, but without any of the injunctive relief she initially demanded. The plaintiff in *Grievson* sought $ 105,191 in attorney fees, but the court awarded only $ 75,885 in attorney fees. Noting the similarity of the facts and procedural posture, but accounting for the passage of time possible differing costs in Western New York and Denver (largely reflected in the hourly rates of $ 195- $ 250 sought by counsel in *Grievson*), it would appear that an award here of approximately $141,000 – nearly double the sum awarded in *Grievson*, is reasonable.

Having thus concluded that the lodestar calculation in this action requires a wholesale reduction of 66% of the fees claimed by Mr. Scott to eliminate hours unreasonably billed by his counsel, the Court finds that the appropriate lodestar figure is $141,032. In addition to his request for fees, Mr. Scott seeks to recover $ 21,996.49 in litigation costs beyond those taxed by the Clerk. Denver's response to Mr. Scott's motion does not address the costs request in any detail. Indeed, Denver's argument on this point appears to consist of the simple request "that the Court determine the reasonableness of this additional cost request in light of the limited success Plaintiff obtained in this case." Denver does not cite to any authority for the proposition that a

cost request should be evaluated by a "degree of success" metric, nor does it offer any particular explanation of what costs could be considered to have been affected by Mr. Scott's limited success. In the absence of any meaningful challenge by Denver to Mr. Scott's cost request, the Court grants the full amount of excess costs Mr. Scott seeks.

Accordingly, Mr. Scott's Motion for Attorney Fees **(# 140)** is **GRANTED IN PART**, insofar as the Court awards Mr. Scott $ 141,032.00 in attorney fees and $ 21,996.49 in costs. The Judgment **(# 131)** in this case is **DEEMED AMENDED** to reflect these amounts.

Dated this 24th day of January, 2014.

**BY THE COURT:**

*Marcia S. Krieger*

Marcia S. Krieger
Chief United States District Judge